**GRANITE VALLEY HOTEL LIMITED PARTNERSHIP, d/b/a Granite Valley Hotel, Respondent,**

**v.**

**JACKPOT JUNCTION BINGO AND CASINO, a Business Enterprise of the Lower Sioux Indian Community, Appellant.**

No. C8–96–1024.

Court of Appeals of Minnesota.

Feb. 18, 1997.

Review Denied April 15, 1997.

John E. Jacobson, Joseph F. Halloran, Jacobson, Buffalo, Schoessler & Magnuson, Ltd., Minneapolis, for Appellant.

Timothy W. Nelson, Nelson Personal Injury Attorneys, St. Cloud, for Respondent.

Considered and decided by RANDALL, P.J., and DAVIES and FORSBERG, JJ.

## OPINION

THOMAS G. FORSBERG, Judge.[*]

This case arises from a breach of contract action filed by respondent, Granite Valley Motel Limited Partnership (Granite Valley),[1] against appellant, Jackpot Junction Bingo & Casino (Jackpot Junction), seeking monetary damages for Jackpot Junction's alleged breach of a motel occupancy agreement. On a pretrial motion, the trial court declared that it had jurisdiction over the case and that Jackpot Junction's owner and operator, the Lower Sioux Indian Community (Community), had effectively waived its sovereign immunity. Jackpot Junction appeals the order declaring jurisdiction, arguing the trial court erred in refusing to defer to the jurisdiction of the Community's tribal court for determination of whether the Community effectively waived its sovereign immunity and consented to the jurisdiction of Minnesota courts. We affirm.

## FACTS

On November 14, 1991, Granite Valley and Jackpot Junction entered into a written agreement whereby Jackpot Junction, through the Community, guaranteed occupancy of a certain number of rooms in the Granite Valley Motel (motel) in exchange for Granite Valley constructing the motel. The contract provided that if the agreed-upon occupancy percentage was not satisfied, Jackpot Junction was obligated to pay to Granite Valley an amount equal to the charter rates for the balance of the unsold rooms. Because construction of the motel would require substantial capital, and the motel's only purpose was to serve Jackpot Junction patrons, Granite Valley required safeguards in the form of contract provisions waiving sovereign immunity and consenting to jurisdiction of Minnesota courts. Allen J. Kokesch, general manager of Jackpot Junction and purported representative of the Community, initiated the contract talks and ultimately signed the contract as "General manager, on behalf of The Lower Sioux Indian Community."

Jackpot Junction performed under the contract until approximately 1993, when it refused to continue paying for unsold rooms. That same year, the Community created its own tribal court, and later began construction on a new motel located on reservation property. On October 27, 1995, Granite Valley filed a complaint against Jackpot Junction in Minnesota district court, alleging breach of contract. Jackpot Junction moved the court to dismiss the action on the grounds of sovereign immunity, invalid consent to jurisdiction, and the doctrine of comity. In response, Granite Valley moved the court for a declaration of jurisdiction, which the court granted. Jackpot Junction now appeals the order declaring jurisdiction.

## ISSUE

When a state district court and a tribal court have concurrent jurisdiction over an

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1. Because the original action was titled as such, the case name reflects respondent's identity as "Granite Valley Hotel Limited Partnership." However, we refer to respondent as "Granite Valley Motel Limited Partnership," the name under which it is registered with the Secretary of State.

action, does the doctrine of comity require the district court to defer to the tribal court's jurisdiction for resolution of sovereign immunity and jurisdictional consent issues?

## ANALYSIS

When a trial court goes beyond the pleadings on a motion for dismissal, this court reviews the trial court's decision under a summary judgment standard. Minn.R.Civ.P. 12.03; *McAllister v. Independent Sch. Dist. No. 306,* 276 Minn. 549, 551, 149 N.W.2d 81, 83 (1967). On appeal from summary judgment, we determine whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). Review under this standard is appropriate here because the trial court issued its order upon consideration of both the pleadings and supporting affidavits.

Jackpot Junction's challenge rests on the theory that notwithstanding a valid exercise of jurisdiction by a state district court, the court must, as a matter of law, defer to the Community's tribal court for determination of whether the Community effectively waived its sovereign immunity and consented to the jurisdiction of Minnesota courts. We disagree.

■ When both a state court and a tribal court have jurisdiction to entertain a dispute involving questions central to the governance of an Indian tribe, the doctrine of comity generally divests state courts of jurisdiction as a matter of federal law if retention of jurisdiction by the state court would interfere with matters of tribal self-government. *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 14–15, 107 S.Ct. 971, 975–76, 94 L.Ed.2d 10 (1987); *see National Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 856–57, 105 S.Ct. 2447, 2454, 85 L.Ed.2d 818 (1985) (reversing exercise of jurisdiction on grounds that exhaustion of tribal remedies is required before claim can be entertained by federal court).

■ Deferral to a tribal court for exhaustion of remedies is not based on whether a trial court properly has jurisdiction over an action. *Klammer v. Lower Sioux Conve-*

*nience Store,* 535 N.W.2d 379, 380 (Minn. App.1995). Rather, it is grounded in the federal policy of promoting tribal self-government. *Id.; see also Iowa Mut. Ins.,* 480 U.S. at 16, 107 S.Ct. at 976 (holding that federal policy supporting tribal self-government "directs a federal court to stay its hand in order to give the tribal court a 'full opportunity to determine its own jurisdiction'") (citation omitted). Thus, the question before us is whether the facts and legal theories underlying this case require analysis of issues central to the governance of an Indian tribe, which must be heard by a tribal court. We hold they do not.

■ Jackpot Junction contends that this case begs the question of proper delegation of authority to Kokesch, and, therefore, it is necessary to review the Community's delegation documents and procedures. However, the facts of this case present issues of contract interpretation and apparent authority, rather than actual authority. In rendering its decision, the trial court reviewed the contract, pleadings, and affidavits submitted by both parties, without having to resort to tribal documents or procedures for guidance. While examination of tribal documents may be necessary to resolve a question of actual authority, apparent authority is a question for the trier of fact to decide after considering the parties' dealings under the contract, the defendant's actions, and other outward manifestations of delegation of authority. *See Hagedorn v. Aid Ass'n for Lutherans,* 297 Minn. 253, 257, 211 N.W.2d 154, 157 (1973) (holding apparent authority presents question for trier of fact). Under these circumstances, we conclude the trial court's exercise of jurisdiction and determination of the Community's waiver of sovereign immunity does not "undermine the authority of the tribal courts" or "infringe on the right of the Indian[ ] [tribes] to govern themselves." *See Williams v. Lee,* 358 U.S. 217, 223, 79 S.Ct. 269, 272, 3 L.Ed.2d 251 (1959) (disallowing state exercise of jurisdiction that would intrude upon authority of tribal courts over reservation affairs).

Jackpot Junction next urges that this court's recent decision in *Klammer* is dispositive in this case. In *Klammer,* the Commu-

nity was the defendant, and we deferred to the tribal court for resolution of jurisdictional and sovereign immunity issues. *Klammer,* 535 N.W.2d at 382. However, *Klammer* is distinguishable from this case. First, the basis of the action in *Klammer* was property damage that occurred on the premises of the Indian reservation, *id.* at 379, whereas this case involves a contract performed off the reservation. Second, unlike the situation here, the Community in *Klammer* did not explicitly waive its sovereign immunity or consent to jurisdiction of the Minnesota courts. *See generally id.* at 380. Because our determination of the Community's sovereign immunity and consent to jurisdiction in *Klammer* necessitated examination of tribal documents such as the "sue and be sued clause" contained in Community documents, that action involved issues of the Community's self-government. Here, however, none of these documents are at issue. Thus, *Klammer* does not impact our ruling today.

Finally, Jackpot Junction's interpretation of the exhaustion rule as applied to these facts would effectively render all waiver and consent provisions in this context impotent. As a result, the Community's economic independence, which forms the basis of the Community's self-determination, would most likely suffer. When the Seventh Circuit confronted a similar fact situation, it noted:

> [E]conomic independence is the foundation of a tribe's self-determination. If contracting parties cannot trust the validity of choice of law and venue provisions, [the Indian business] may well find itself unable to compete and the Tribe's efforts to improve the reservation's economy may come to naught.

*Altheimer & Gray v. Sioux Mfg. Corp.,* 983 F.2d 803, 815 (7th Cir.1993), *cert. denied,* 510 U.S. 1019, 114 S.Ct. 621, 126 L.Ed.2d 585 (1993). This is surely the case here, where the Community actually performed under the contract for several years before deciding to breach the contract and build its own motel. For the above reasons, we hold the trial court did not err in refusing to defer to the Community's tribal court for determination of whether the Community effectively con- sented to jurisdiction of the Minnesota courts and waived its sovereign immunity.

## DECISION

Because the district court in this case may decide contract and apparent authority issues without interfering with matters of tribal self-government, the court need not defer to the jurisdiction of the tribal court for resolution of whether the Community effectively waived its sovereign immunity or consented to state court jurisdiction.

**Affirmed.**

RANDALL, Judge (concurring specially).

In Indian country it is what you know, not what you read. The truth is in the shadows, in the wind, in the water, in the rocks, and in the silence.

Gerry Spence, the noted Wyoming trial attorney, is a self-styled "gunner for justice." Spence, who has a deserved reputation for backing up what he says, learned early in life the importance of not just reading, but thinking; of not just looking, but seeing; of not just hearing, but listening. In his book, *With Justice for None,* he uses a quote from Thomas Hobbes to make the point:

> Although I respect the valuable insights of some academicians, and shamelessly cite them as authorities whenever it serves my purpose, I believe their conclusions are often flawed, for they have failed to expose themselves in the workplace of the law, in the pits where the killing is done and the most pungent truths revealed. Naturally my kind likes the boast of Thomas Hobbes: "Had I read as much as other men, I should have known as little as other men."

Gerry Spence, *With Justice for None,* at xi (1989).

Albert Einstein, himself one of the most gifted thinkers and theoreticians of all time, also knew the importance of participation in life and hands-on experience to supplement that which can be gained from books, and at times to learn what cannot be understood from books at all. Einstein was an acknowledged opponent of armed conflict and, thus, also an opponent of virulent "nationalism" and excessive trumpeting of "sovereignty." The fledgling League of Nations in 1931 "en-

couraged an exchange of letters between leaders of thought" for the purpose of bringing to bear the best minds of the time on the problem of war, a subject which to Einstein was "the most insistent of all the problems civilization has to face." As part of the collection of letters, Einstein wrote a letter of four pages to Dr. Sigmund Freud, which was later published in a limited edition under the title "*Why War?*"

In pertinent part, Einstein said:

These are the actions which have always been successful when the goal was to bring together larger political communities, and in this way to prevent armed conflict between them. The road to international security demands the unconditional renunciation by all nations of part of their freedom of action and sovereignty. I doubt that there is another way to international security.

* * * The desire for power makes the ruling party of a nation resist any limitation of its rights to sovereignty; the leaders feel their position of power threatened, as do industrialists whose economic strength is based on armaments and war.

Albert Einstein, *Why War?* (1933). Einstein then went on to discuss a question that puzzled him, namely how groups of people could permit themselves "to become aroused to the point of insanity and eventual self-sacrifice * * *." *Id.*

In answering his own question as to how communities of people could get so far off track, he pointed unerringly to the inability of the "ivory tower crowd" to contribute to the formation of social justice in a multicultural world, war being the extreme example of social injustice. Einstein said:

This leads me to a last question: is it possible to so guide the psychological development of man that it becomes resistant to the psychoses of hate and destruction? I am not thinking only of the so-called uneducated. In my experience, it is much more the so-called intelligentsia who succumb most readily to mass suggestion, because they are not used to drawing immediately from experience but encounter life

in its most easily and completely understood form—the printed page. *Id.*

It can be said that the unlikely trio of Thomas Hobbes, Gerry Spence, and Albert Einstein would have been able to contribute to the serious and institutionalized problems facing Indian country today. You see, all three had the courage to face issues of social justice, not shy away from them.

I concur specially in the result, our affirmance today of the trial court on all issues. That affirmance takes but a quick look at prevailing contract law. The essence of contract law is that parties should do what they say they will do. Our decision here assures simply that, as Justice William Mitchell once said, "just debts will be paid." But I have to add to the analysis of my colleagues to cover the real issue of whether appellant, a recognized Indian reservation, is a true "Sovereign Nation," or is rather a semi-sovereign governmental entity. Appellant demands an answer to that issue. I suggest that case law, when read, not just cited, makes it clear that reservation tribal governments are not true independent sovereigns, but rather semi-sovereign entities totally under the jurisdiction of the United States Congress and the United States Supreme Court. In fact, there are no cases that state otherwise.

The eleven American Indian reservations in this state, the four Dakota Sioux (including appellant) south of the metro area, and the seven Anishinabe/Ojibwe reservations in the northern half of the state are simply eleven semi-sovereign governmental entities, but, tragically, eleven semi-sovereign governmental entities that do not extend the basic rights of the Minnesota Constitution and the United States Constitution to their people.

This lawsuit on its face is a simple breach of contract lawsuit for money damages brought by respondent against appellant. But appellant, in its reply brief, **challenged** this court to go outside the black letter, four corners of the contract (the contract itself, the court file, and the entire record to date show an alleged blatant breach of that contract by appellant) and **address issues of sovereignty and sovereign immunity.** I ac-

cept the challenge. Appellant has a right to that. It is entitled to a legal analysis.[2]

I agree with appellant that "sovereignty" and sovereign immunity is the only real issue in this case. If it were not for this issue, both appellant and respondent, as they agreed to in writing, would be presenting their respective claims and defenses in the Minnesota District Court for the Fifth Judicial District, Redwood County, where this case started and from where the appeal came to this court. But as appellant's brief states:

> In reality, Granite Valley alleges that it has an enforceable contract with a sovereign tribal government, and that the contract may be enforced in State Court based on the purported assent of that government. These assertions **require** a court's analysis to go beyond simple notions of contract law, to also address issues of sovereignty and sovereign immunity.

Appellant's reply brief further declares:

> With this backdrop, the District Court should have looked at the **core challenge** to the contract in this action: **The authority, or lack thereof, of a non-Indian to waive tribal sovereign immunity.** In addressing this challenge the Court undoubtedly **would be required to evaluate tribal sovereign immunity, relevant tribal resolutions or ordinances regarding waivers of immunity,** and possibly the common practice and custom of the Community in waiving its immunity.

(Emphasis added.)

The facts are simple and not in dispute. Respondent Granite Valley Motel is a limited partnership consisting of eight individual investors. Appellant Jackpot Junction is a business enterprise of the Lower Sioux Indian Community and operates as a casino on Indian land near Morton, Minnesota, in Redwood County.

Appellant wanted an off-reservation motel close enough for its patrons. Respondent was willing to consider a substantial investment but needed a guaranteed occupancy of a certain number of rooms in its motel, as without guaranteed occupancy (meaning guaranteed cash flow) by appellant, there would be no reason for respondent to construct a motel in a relatively isolated area. Appellant understood this fully and completely, and as a part of the negotiations agreed in the written contract that appellant would guarantee occupancy of a certain number of rooms until 1999.

Respondent wanted a specific waiver of sovereign immunity and a specific consent to Minnesota state court jurisdiction written into the contract as part of the negotiations and before respondent would sign it. Appellant understood these negotiations and consulted with an attorney about them. The uncontradicted affidavit of plaintiff J.P. Martin is part of the trial court record. It said in pertinent part:

> I had discussions with Mr. Kokesch about the issue of sovereign immunity and he told me that he had talked to another individual by the name of Bluedog, and that I should go ahead and put that clause in the contract if I was concerned about that issue.

Appellant and respondent expressly wrote into the contract a waiver of immunity and an express consent to Minnesota state court jurisdiction. Nothing was put into the contract, or even discussed by appellant, formally or informally, that they wanted to "reserve the right to back out" of this express waiver of immunity. Neither the negotiations nor the written contract contained any reference to appellant's tribal court system. As of the date of the signing of the contract, appellant **did not have** its own tribal court system.

---

**2.** An early comment on the length of this concurrence is appropriate. As Tolstoy might have said, *"Anna Karenina* is long, but I believe it to be worthwhile. I have written another book called *War and Peace.* I suggest it would be helpful in understanding the historical perspective of my homeland, Russia, and why I love it so much to read them both."

I suggest that *Cohen v. Little Six, Inc.,* 543 N.W.2d 376 (Minn.App.1996) (Randall, J., dissenting), *aff'd* (Minn. Jan. 21, 1997), be reread along with this opinion. The two opinions, taken together, just begin to scratch the surface of the history of American Indian people and their struggle for social justice. But the two, taken together, may, like *War and Peace,* show how a trickle of blood from a scratch can escalate to a river, and then to a raging flood.

They created one later. (Evidence is accumulating that the fairly recent creation of tribal courts in Minnesota may be part of a calculated plan by tribal governments and their advisors to create a totally controlled in-house court system to shield themselves from lawsuits and accountability in state district court where the mandates of state and federal constitutions apply.)

The contract was formalized in writing and appears in full in respondent's brief. The contract is dated November 6, 1991 and was signed on November 14, 1991 in the following manner:

Yours truly,

GRANITE VALLEY MOTEL LIMITED PARTNERSHIP

By: Hall & Associates, Inc.

Its Managing General Partner

By: /s/ Greg Hall

Greg Hall, C.E.O.

Agreed and acknowledged this 14 day of November, 1991, by The Lower Sioux Indian Community, owner and operator of Jackpot Junction Bingo and Casino.

/s/ Allen J. Kokesch

General Manager, on behalf of The

Lower Sioux Indian Community

The contract contains five sections. The second section shows the term of appellant's guarantee to respondent. This section is part of the breach and states:

2. Term of Guarantee. This is a continuing guarantee, for the term commencing on commencement of occupancy of the motel and ending December 31, 1999.

Appellant unilaterally breached this contract in 1993 and refused to perform under its terms.

That same year, appellant created its own tribal court under its own jurisdiction, which tribal court appellant now wants to hear this lawsuit first. Appellant then went on to construct its own motel on reservation property which directly competes with respondent's. At the same time, appellant continued an ongoing breach of its contract with respondent. The waiver of immunity and consent to jurisdiction in Minnesota district courts is set out in the third section, which states:

3. Waiver. The Guarantor hereby waives sovereign immunity by virtue of its status as an independent Indian Nation and consents to jurisdiction of the Courts of the State of Minnesota in the interpretation and enforcement of this contract of guarantee.

Appellant, as "Guarantor," continued on in the fourth section, which states:

4. Character of Obligation. The obligation of the Guarantor is a primary and unconditional obligation binding upon this Guarantor, its legal representatives, successors and assigns.

After appellant unilaterally breached the contract and refused any consideration to respondent, respondent, pursuant to the contract, sued in the closest Minnesota district court with venue and jurisdiction. The trial court, which we affirm today, found that with the words of the contract clear and unambiguous, there was no need to look beyond the four corners of the contract.

The trial court, in ruling that respondent had the right to bring this lawsuit in district court and that the trial court had the authority to keep the lawsuit there, stated in its memorandum:

At this stage of the proceedings the contract must be examined on its face. The contract under the heading "Waiver" states, "The Guarantor hereby waives sovereign immunity by virtue of its status as an Indian Nation and consents to jurisdiction of the Courts of the State of Minnesota in the interpretation and enforcement of this contract of guarantee." The document is signed by a representative of plaintiffs, as well as Allen J. Kokesch, General Manager, on behalf of The Lower Sioux Indian Community. Above Mr. Kokesch's signature is an acknowledgment "by The Lower Sioux Indian Community, owner and operator of Jackpot Junction Bingo and Casino."

In its memorandum, the trial court went on to state:

At this stage of the proceedings the Court must give great deference to the face of the contract, which contains the explicit waiver of sovereign immunity referred to above. If assertions by affidavit at this early stage of the proceeding were sufficient to remove this matter to tribal court, then the *clear waiver of sovereign immunity clause in the contract would be without meaning.*

(Emphasis added.)

In its memorandum, the trial court pointed out that even the United States, a true sovereign, can consent to be sued, waive its sovereign immunity, and further stated

that when consent to be sued is given, the terms of the consent establish the bounds of a court's jurisdiction. *United States v. Mitchell,* 445 U.S. [535] at 538 [100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607 (1980)]; *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058, (1941); *Reynolds v. United States,* 643 F.2d 707, 713 (10th Cir.), *cert. denied,* 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 85 (1981).

The court finds that this contract does contain an expressed waiver of sovereign immunity, and as such establishes this Court's jurisdiction over the above-entitled matter.

Appellant, in attempting to get out of a contract which it signed and a contract for which it has yet to allege a defense on the merits, spends most of its energy in its brief arguing that *Klammer v. Lower Sioux Convenience Store,* 535 N.W.2d 379 (Minn.App. 1995), controls.

Once the facts of *Klammer* are read, it is clear that it is distinguishable and does not have relevance to the legal issue here, other than to buttress our affirming the trial court. In *Klammer,* there was neither a negotiated consent to jurisdiction nor a negotiated waiver of immunity clause. There could not have been. *Klammer* was a spontaneous tort which resulted in property damage. In *Klammer,* a non-Indian patron of a convenience store owned by the Indian Community sued the Indian Community for property damage when a ruptured hose at the store sprayed fuel over him and the passengers in his car. *Id.* at 380.

Obviously, Klammer and the convenience store owners did not sit down together and bargain out in writing where jurisdiction would lie and whether immunity would be waived if he should drive up to the store and have fuel sprayed on him. Thus, because it was a spontaneous inadvertent act happening on a reservation, the *Klammer* court felt compelled to go through an analysis of concurrent jurisdiction and comity. Our decision in *Klammer* points out the murky swamp that state and federal courts find themselves mired in when they attempt, in good faith, to research "appellant's version of sovereignty." The *Klammer* court ended up comparing identical tribal constitutional provisions of two different tribes and concluding that identical wording in the two constitutions could be interpreted two different ways. *Id.* at 382–83.

A semi-sovereign governmental entity is a large category including the 50 states of the United States of America and the many counties, towns, cities, school districts, etc. within a state that are also governmental entities with some limited or qualified immunity from lawsuits. All semi-sovereign governmental entities have carefully structured limited or qualified immunity to make certain discretionary decisions without fear of being sued. All semi-sovereign tribal entities should have a right to this once their organizations, as law-abiding municipalities subject to state law, including the Minnesota Constitution, and the federal Constitution, are in place. This is the only way to give Indian people half a chance to make it to the twenty-first century.

So far, we have not seen fit to require tribal governments to abide by the United States Constitution, its Bill of Rights, and individual state constitutions. This is both morally and legally inexcusable, as it is a race-based distinction—not helping a race, but killing a race.

This is the black hole we put ourselves into as long as we avoid the hard issue of sovereignty, **which appellant has correctly framed as the real issue in this case. I**

**respect appellant for articulating the real issue.**

Economic transactions and commercial intercourse between off-reservation entities and tribal governments is already beginning to seriously decline to the disadvantage of Indian people. Sovereignty, as now used, is causing the disintegration of tribal government credibility. This deterioration of tribal credibility is noted in federal court cases.

When faced with facts similar to ours, the Seventh Circuit Court of Appeals has refused to defer to a tribal court. *See Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 815 (7th Cir.1993) (holding that tribal exhaustion doctrine did not require stay of proceedings in federal court). In *Altheimer*, an Illinois corporation brought suit against an Indian manufacturing corporation for breach of contract. *Id.* at 807. The parties signed a letter of intent, upon which the contract was based that included a waiver and consent provision almost identical to the one in this case. *Id.* The *Altheimer* court held that it is necessary in every exhaustion rule case to examine the factual circumstances of the case "in order to determine whether the issue in dispute is truly a reservation affair entitled to the exhaustion doctrine." *Id.* at 814.

Significantly, the *Altheimer* court held that by including the waiver and consent provision in its contract, the Indian community "wished to avoid characterization of the contract as a reservation affair by actively seeking the federal forum." *Id.* at 815. *Altheimer* further stated:

> In the Letter of Intent, [the Indian company] explicitly agreed to submit to the venue and jurisdiction of federal and state courts located in Illinois. **To refuse enforcement of this routine contract provision would be to undercut the Tribe's self-government and self-determination.** The Tribe created [the company] to enhance employment opportunities on the reservation. * * * [E]conomic independence is the foundation of a tribe's self-determination. If contracting parties cannot trust the validity of choice of law and venue provisions, [the Indian company] may well find itself unable to compete and

the Tribe's efforts to improve the reservations' economy may come to naught.

*Id.* (emphasis added).

A recognized exception to the normal regard for "comity" is bad faith. The requirement does not apply where

> assertion of tribal jurisdiction "is motivated by a desire to harass or is conducted in bad faith," or * * * where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction.

*National Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 856 n. 21, 105 S.Ct. 2447, 2454 n. 21, 85 L.Ed.2d 818 (1985) (quoting *Juidice v. Vail*, 430 U.S. 327, 338, 97 S.Ct. 1211, 1218, 51 L.Ed.2d 376 (1977)).

The undisputed facts here fit precisely within the "bad faith exception" to the exhaustion rule. Appellant intentionally waived sovereignty and consented to state court jurisdiction to get economic benefits from respondents. Appellant operated for two years under the contract and took the benefit of the contract. It breached the contract in 1993 and started construction of its own hotel on reservation property. Appellant's decision to breach the contract was the product of pure opportunism and not the product of any "cultural decision" to have its own hotel. At the same time its own hotel was constructed, appellant instituted its own tribal court that would be a friendly forum for appellant, which is perhaps more than a coincidence.

Now, examine the "court" that appellant insists should have the privilege of original jurisdiction, the absolute right to first look at the issues. This is the court that appellant infers could do a better job than a Minnesota district court examining the "authority, or lack thereof, of a non-Indian to waive tribal sovereign immunity." After examining appellant's brief and the tribal constitution of appellant, the remark about a non-Indian perhaps not having the authority to waive immunity is a nonargument at best, an inherently racist remark at worst. I question whether the argument is even appropriate to voice in a legal brief. In the Minnesota

Court of Appeals, the Minnesota Supreme Court, and our state trial courts, each having state-wide jurisdiction, there are judges representing both genders and all four colors, red, black, yellow and white. My use of descriptive colors is not belittling, but cultural to Native people. In Indian culture, these four colors are considered sacred, representing the four winds, the four directions, the four great races, and other symbolism. What I write about the four colors is true and culturally correct enough for analysis.

The four colors accurately describe our multi-cultural state and country. All "real" judges, state and federal, have the inherent power on cases that come before them to reflect on and decide the merits irrespective of their own particular race and irrespective of the race, creed or culture of litigants.

Appellant's argument about non-Indian versus Indian becomes arrogant and fatally flawed. The Lower Sioux Judicial Code itself, the one appellant wishes to control the outcome of this case, **does not even require that the judges have Indian blood to any degree.** That is not surprising. Throughout the Indian reservations in this state that have tribal courts, non-Indians, at times, have served on some or all of them. Appellant's constitution in Chapter 3 provides:

### JUDGES

Section 1. *Number of Judges.*

The Tribal Court shall have a panel of three judges, a Chief Judge and two Associate Judges, at least two of whom shall be lawyers experienced in the practice of Tribal and federal Indian law and licensed to practice in the highest court of any state. By resolution, the Lower Sioux Community Council may increase the number of Associate Judges.

There is nothing in the rest of Chapter 3 indicating that any quantum of Indian blood is needed. What the constitution and the judicial code make clear is that the reservation business council (the equivalent of a mayor and city council members) itself maintains **absolute control** over the qualifications, appointments, salaries, and hiring and firing of those who serve as tribal judges.

Appellant allows a nonlawyer to be a judge. Appellant requires that the other two judges on its three-judge panels be licensed to practice in **any** of the 50 states. Thus, appellant's court claims the authority over the liberty and property of Minnesota Indians and Minnesota non-Indians alike without adhering to the slightest shred of qualification under the laws of Minnesota and the Minnesota Constitution pertaining to the appointment, qualifications, selection, and disciplining of state judges. The Minnesota Supreme Court retains to itself (as the supreme courts of most states presumably do) the final determination on who shall be allowed to take the Minnesota State Bar examination and who is qualified to be sworn in. They retain to themselves the final authority to consider the fitness of a judge, including all discipline, from mild censure up to removal from office. All lawyers and judges in Minnesota know these rules and submit to them and all other Minnesota legislation that affects our courts. Now, to the point. Neither the Minnesota Supreme Court nor the Minnesota Legislature has any authority or control whatsoever over who any tribal government chooses to call a "judge."

Appellant's Judicial Code, under "Qualifications" provides:

Section 4. *Qualifications.*

In addition to the qualification requirements in Section 1, each judge must also be 25 years or older. The following individuals may not serve the Community as judges of the Tribal Court:

(a) The Clerk of Court, Assistant Clerks, and members of the Lower Sioux Community Council;

(b) Those who have been convicted by a court of the United States or of any State of the United States for a felony, as a felony is defined by the laws of that jurisdiction or misdemeanor **within one year** immediately preceding the proposed appointment or contract as judge or justice.

(Emphasis added.)

It must be observed that since appellant claims the right to set judicial qualifications, or the lack thereof, it could, with impunity,

reduce the time after conviction for a crime from twelve months down to twelve days, or do away completely with this "hinderance." It has the authority, by amendment, to do away with the requirement that two of the three tribal court judges be lawyers admitted to practice before **any** state. Under its version of "sovereignty" and its judicial code, three lay persons that it decides to appoint, all previously convicted of a crime, could decide the liberty and property of all state residents, Indian and non-Indian, who come before them.

Each of the eleven Minnesota reservations claims it is an individual sovereign and thus can have its own rules and its own constitutions. All eleven cite the same cases and arguments that appellant cites here to support their claim for their own "independent courts" and their own "sovereignty." Thus, it is appropriate to consider abuses on other reservations, as each of the eleven claims it would have the authority to do likewise if it so wished. They might say, "Well, we would never do that," but they would always retain the right to change their mind under their version of "sovereignty" and do that. Just ask them.

On one reservation in this state, there is in place what I consider to be the worst individual case of abuse of judicial process, and abuse of a state citizen, that I have ever seen.

A Red Lake ordinance allowing tribal judges to overturn jury verdicts will face its first constitutional test in a federal court's response to a habeas corpus petition by Ronald Smith.

Smith was found not guilty of marijuana possession Jan. 25 by five of six Red Lake jurors. But Chief Magistrate Wanda Lyons, **citing a Red Lake ordinance passed just two weeks earlier, overturned the verdict and remanded Smith to the reservation jail, where he is currently serving a 150 day sentence.**

A petition of Habeas Corpus from a prisoner requires a federal court to rule on whether that detention is in violation of the petitioner's constitutional or legal rights.

Passed Jan. 9 by a nearly unanimous vote of the tribal council, Red Lake Ordinance 407.115 stipulates that "the judge in a criminal case may render a verdict contrary to that reached by the jury." Although a jury determination of guilt still requires such a finding by "all the jurors except one," the presiding judge could arbitrarily, and without explanation, set aside a guilty or not guilty verdict.

Smith's brief for Habeas Corpus asserts that the law renders the jury process irrelevant. "The Tribe, by enacting Section 407.115, has clearly taken the position that its members are not entitled to a jury trial in criminal cases," states the brief prepared by Minnetonka attorney Richard Meshbesher. The attorney argues that the law is contrary to the fourth and six [sic] amendments to the U.S. Constitution, as well as a violation of the Indian Civil Rights Act's guarantee of "due process of law."

Prosecutor attorney Denfield Johnson referred questions on the subject to his "bosses," the Red Lake Tribal Council. Council chairman Bobby Whitefeather and secretary Judy Roy were unavailable for comment.

Jeff Armstrong, *Red Lake man jailed, sentenced after not guilty jury verdict*, Native American Press, Mar. 8, 1996, at 1 (emphasis added).

I have no knowledge that even in any part of the deep South between the Emancipation Proclamation in 1863 and *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), in 1954, any sitting judge, trial or appellate, claimed the right in a criminal case to take a verdict of not guilty away from a jury, convict the defendant, and sentence him to imprisonment.

The outcome of the above-described travesty was that defendant's attorney brought a writ of habeas corpus in federal court and while the magistrate was taking the matter under advisement, the tribal government and its prosecutors folded and plea bargained the matter out. They knew better than to risk a full and open public hearing on the record on this issue.

The sequence of events makes it clear, by definition, that Indian tribes are not true

"Sovereign Nations," but remain, as always, subject to the plenary power, and the will and complete control of Congress, and ultimately the federal judiciary. If they were truly sovereign, there would not have been a legal writ in the nearest federal court, thus denoting jurisdiction and power over the proceeding there. Neither the tribal court nor the tribe even attempted to keep the matter out of federal court on the grounds that a Minnesota federal court had no right to hear it. The deeper issue is, why such a complete lack of oversight over important constitutional guarantees on Indian reservations, an oversight to the point where this tribal ordinance was passed and actually enforced, and would still "be in force" and hidden from public view except for exposure by the press.

In Minnesota when you have successfully passed the Minnesota Bar examination and have been sworn in, your admission to the nearest federal district court and the federal system, although ceremonial, is automatic. A licensed attorney, not under some form of suspension, can go into any court in this state without fear and represent his or her client. On reservations throughout Minnesota, tribal governments have set extra qualifications over and above admission to the Minnesota Bar, have at times refused to admit licensed members of the Minnesota Bar to its tribal courts, and at times have prevented litigants in tribal court from bringing in the attorney of their own choosing. Some tribal courts in this state do not let you bring in your own attorney on family law matters, but instead give you a "court-appointed advocate" who may or may not be an attorney.

Whether advocates are attorneys or not, they are selected by tribal government. Their qualifications, or lack thereof, are set by tribal government and their hiring, salaries, and discharge are under the control of tribal government.

Recently a non-Indian woman living outside a reservation started a divorce action with her Indian spouse, who was enrolled on a reservation. She commenced a lawsuit in a proper state district court with venue and jurisdiction. He commenced his lawsuit in the tribal court. The tribal court somehow obtained jurisdiction on her divorce, including matters of child custody, and she was required to go into tribal court **without her attorney** and instead with a court-appointed advocate. Although technically the tribal court gave a version of joint legal and physical custody and visitation, etc., she has had a tremendous hardship getting visitation off the reservation to the point where her own attorney suggested, only half in jest, that if she was on the reservation and could get her children into a car, it would be wise to speed across the reservation borders and attempt to bring the minor children within the venue of the local state district court. She and others similarly situated have faced severe obstacles in getting visitation and in the collection of child support from on-reservation obligors. Minnesota's normal legislatively-mandated enforcement provisions run into serious problems when the obligor lives and works on a Minnesota reservation. It can be noted that the off-reservation spouse can be either Indian or non-Indian; he or she will still have the same problems in reservation tribal courts when going up against a reservation resident.

It has become common knowledge throughout the state for attorneys whose clients have commercial or personal dealings with reservations that tribal courts should be avoided if possible.

There is a cruel irony in the case before us. It is that appellant would have had every single right to go into state district court and demand that its contract be honored by respondent if respondent had committed the alleged open and blatant breach. I suggest that appellant's attorney, if respondent had breached the contract, would have immediately sued the matter out in state district court, as would be his right, to ensure that his client, tribal government, would have a full and fair hearing in an independent state judicial forum with the power to grant the judgment and the power to enforce it against respondent if respondent's breach was proven.

After the courts of this state, trial and appellate, have gone out of their way to construe, on behalf of tribal government, the consent to sue and be sued clauses and waiver of jurisdiction, in favor of tribal govern-

ment, here is appellant's position today. Even with a specific waiver in place that they do not deny, they refuse to willingly come into state district court to which they would have an absolute right of access if they so chose.

Indian people living on reservations know that change must come and they know they will suffer economically if change does not come, since without change, tribal government credibility will disappear. As the *Altheimer* court noted:

> If contracting parties cannot trust the validity of choice of law and venue provisions, [the company] may well find itself unable to compete and the Tribe's efforts to improve the reservation's economy may come to naught.

983 F.2d at 815.

The recent flow of Minnesota cases, trial and appellate, have had nothing to do with cultural preservation. They have to do only with money and a tribal government's continued insistence on the right to be unaccountable to anyone, Indian or non-Indian, in any state court, unless they choose to go to state court. Otherwise they try to force parties into their own hired tribal courts.

The bulk of Minnesota cases have involved reservations with Indian gaming casinos stubbornly refusing to defend the merits of any case in state court.

It is not known to all reading this opinion that the following list of state and federal constitutional guarantees and rights are not in place for Minnesota Indians domiciled on a reservation:

> There is no guarantee that the Minnesota Constitution, the United States Constitution and its precious Bill of Rights will control. There are no guarantees that Civil Rights Acts, federal or state legislation against age discrimination, gender discrimination, etc. will be honored. There are no guarantees of the Veteran's Preference Act, no civil service classification to protect tribal government employees, no guarantees of OSHA, no guarantees of the American with Disabilities Act (1990), no guarantees of the right to unionize, no right to Minnesota's teacher tenure laws,

no right to the benefit of federal and state "whistleblower" statutes, no guarantees against blatant nepotism, no guarantees of a fair and orderly process concerning access to reservation housing, and no freedom of the press and no freedom of speech. In other words, all the basic human rights we take for granted, that allow us to live in dignity with our neighbors, are not guaranteed on Indian reservations under the present version of "sovereignty."

In *Tom v. Sutton,* the court stated in part:

> This holding is consistent with other judicial decisions finding the Constitution inapplicable to Indian tribes, Indian courts and Indians on the reservation.

533 F.2d 1101, 1102–03 (9th Cir.1976).

It is ironic that every Minnesota Indian who resides one foot **off** a reservation, is guaranteed the benefits of the Minnesota Constitution and the United States Constitution and its Bill of Rights. It is only on eleven tiny enclaves within this state that this state's residents are deprived of due process of law and deprived of the benefits of the state and federal constitutions.

This opinion is not meant to state that every single one of the eleven reservations practices all of the above enumerated abuses. But this opinion *is* meant to state that the above enumerated abuses have taken place in at least some places and are taking place today, and any inquiry into a tribal government council as to whether they will fully honor the Minnesota Constitution and the United States Constitution is met with the same rigid response: in effect, we may or we may not, but whatever we do will be totally up to us and our "sovereignty."

Even the federal government, although it prolongs the present inept version of sovereignty, knows better. The federal government recognizes that tribal governments and reservations do not act independently, but under the will of Congress. When the federal government decides to act, it pays no attention to claims of sovereignty. Such is the case with serious felonies, such as those tried to a conclusion in 1996 involving two different northern Minnesota reservations. One of the first defenses of the defendants

was that the federal district court (meaning the federal government) could not do anything about the alleged crimes and could not put the defendants in harm's way before a federal jury, because whatever was alleged to have happened, happened on a reservation and, thus, the reservation's sovereign immunity protected the defendants from accountability in federal district court.

The defense was listened to and then immediately swept away. The defendants were put on trial in federal district court in St. Paul, Minnesota. Ironically, all defendants enjoyed in federal district court an absolute guarantee to all rights mandated under the United States Constitution, which rights they would not have been guaranteed if they had been tried in their own tribal courts. To any knowledgeable observer of tribal reservation courts and of how they are controlled by tribal government, any trial in a tribal court involving these defendants would have been a meaningless sham. You see, tribal governments, such as appellant here, claim the power to isolate and immunize themselves **even from their own tribal courts.** This is something not even a true sovereign dares do. The United States Supreme Court, not the Executive Branch, retained control over the Watergate investigation and the Nixon tapes. Indian tribal government and their advisors claim an immunity Congress does not even give to itself or the Oval Office or the federal judiciary. Nor has the Oval Office or the federal judiciary ever claimed for itself total immunity. No person in this country is totally free of a possible federal indictment for misuse or abuse of the public trust or for misfeasance and nonfeasance. President Ford granted to former President Richard Nixon an unconditional pardon for possible acts committed while in the Oval Office. Ford did not grant Nixon the pardon because Nixon had total sovereign immunity for acts committed while in the Oval Office; Ford granted Nixon the pardon because he did not.

Appellant's Judicial Code in Chapter II entitled "Jurisdiction" in Section 3(a) provides:

Section 3. *Suits Against the Tribe.*

(a) *Sovereign Immunity of Tribe.* The sovereign immunity from suit of the Tribe and every elected Lower Sioux Community Council member or tribal official with respect to any action taken in an official capacity or in the exercise of the official powers of any such office, in any court, federal, state or **tribal** is hereby affirmed; nothing in this Code, with the exception of subsection (d) of this section, shall constitute a valid waiver of the Tribe's sovereign immunity. **The Tribal Court shall have no jurisdiction over any suit brought against the Tribe** in the absence of an unequivocally expressed waiver of that immunity by the Lower Sioux Community Council.

(Bold emphasis added.)

In Section 3(d), respondent waives its own sovereign immunity and consents to the tribal court hearing the suit, **just** for the limited purpose of determining "the eligibility of Tribal members for per capita payments made pursuant to a Lower Sioux Community in Minnesota Tribal plan to distribute funds from Tribal Gaming enterprises."

Respondent, Granite Valley, is a group of individuals being threatened with the possible deprivation of their property by tribal judges over whom they have absolutely no input. Why is this startling, even profound? The answer is that it exists nowhere else in this country.

The partners in respondent and all members of the Lower Sioux Community have, as they should, the right of a direct vote on all state district court judges in their judicial district, all intermediate appellate judges in this state, and all members of the Minnesota Supreme Court. All of the partners in respondent and the members of the Lower Sioux Community enjoy a direct voice in the election of state representatives, senate constitutional officers, and the governor. They therefore have a direct vote over those by whom they will be governed, and a direct vote for governor, which is an indirect vote for the state judges that a governor appoints.

In the federal system, both Indians and non-Indians enjoy a direct vote for United States senators and, through the electoral college, an indirect vote for the president.

Thus, although federal judges do not submit to direct election, Indians and non-Indians, as American citizens, can vote for those who control the appointment of federal judges, *i.e.*, the President and members of the United States Senate. Conversely, the partners in respondent have absolutely no input into the selection or appointment of tribal judges.

Ironically, the northern Minnesota defendants who stood trial in St. Paul federal district court enjoyed a number of constitutional guarantees that would not have been guaranteed in their own reservation tribal courts. They enjoyed constitutional guarantees to the right to pick the best possible criminal defense attorney they could afford. They were able to afford some of the finest in Minnesota.

If they had pleaded poverty, they would have been assigned one of the many excellent federal court public defenders. They enjoyed a constitutional guarantee to a trial by a jury. They enjoyed a constitutional guarantee to a trial conducted by an independent and neutral federal judge, a federal judge enjoying objective qualifications for that post. They enjoyed a constitutional guarantee to an orderly and thorough appellate court process up to the United States Supreme Court, all before independent, neutral, and qualified judges.

The defendants enjoyed, as they would not have done in tribal courts, a constitutional guarantee to the right of a not guilty verdict by the jury on whatever count or counts the jury found the prosecutor did not prove beyond a reasonable doubt. Of the multiple counts against all defendants, some defendants had more than others. The two different federal juries returned some counts of not guilty. The federal trial judge took no further action on the not guilty counts. The federal prosecutor did not request any. Those not guilty verdicts stand forever.

The two sets of federal criminal cases to which I have referred, and to which it is proper to refer, as they are part of an open public judicial record, are not about anything more, tragically, but greed.

As a former criminal defense attorney for 17 years, both in private practice and as a part-time public defender, and as an appellate judge for 13 years, I have a deep appreciation for the difference between pretrial allegations, in either criminal complaints or indictments, and what is later proven, or found to be unproven, after a full trial. Routinely, pretrial allegations, no matter how strongly stated, result in not guilty verdicts in state and federal courts. On some occasions, pretrial allegations are found not only to not be proven by a reasonable doubt; at times the evidence at trial may show the pretrial allegations to be nearly or totally unfounded.

But after a full and fair jury trial in state or federal court, and after a jury has rendered a verdict of guilty by proof beyond a reasonable doubt, the highest standard in any case in any court in this country, those convictions stand as an open public record that the defendants, after having been given their constitutional right to a fair trial, were found guilty by proof beyond a reasonable doubt.

In the two sets of trials involving Northern Minnesota reservation tribal council members and advisors, the pretrial allegations included multiple counts of:

conspiracy to defraud the United States/misapplication of tribal funds; embezzlement; interstate commerce/money laundering; civil rights conspiracy; mail fraud; conspiracy scheme to defraud the United States; theft/misapplication of tribal funds—aiding and abetting; theft involving program receiving federal funds; scheme to defraud; aiding and abetting.

At the conclusion of the two lengthy trials involving multiple defendants, the verdicts of guilty included:

conspiracy to defraud the United States/misapplication of tribal funds; embezzlement; interstate commerce/money laundering; civil rights conspiracy; mail fraud; conspiracy scheme to defraud the United States; theft/misapplication of tribal funds—aiding and abetting; theft involving program receiving federal funds; scheme to defraud; aiding and abetting.

Thus, two of eleven, or close to 20 percent of all tribal governments in Minnesota, were

found to contain systemic and institutionalized corruption, and the evil that corruption brings. The evidence at trial revealed that this systemic and institutionalized mismanagement stemmed from unaccountable casino money. The unaccountability stems directly from the lack of state and federal oversight. That lack of oversight is directly attributable to tribal "sovereignty." The investigation of other Minnesota reservations with gaming casinos continues today.

This mismanagement is a direct result of the "myth of sovereignty" protecting tribal leaders and tribal government from the normal rules of federal and state accountability. It has been noticed by Indian and non-Indian leaders alike.

Robert A. Fairbanks is an enrolled member of the Minnesota Leech Lake Ojibwe Reservation and presently resides in Oklahoma. A small portion of his resume includes the following: Juris Doctor, University of Oklahoma; Master of Laws, Columbia University; Master of Education in Teaching Math and Science, Harvard University; Master of Arts in Medical Science, Stanford University; Master of Business Administration, Oklahoma City University; Master of Criminal Justice Administration, Oklahoma City University; Colonel, United States Air Force, Judge Advocate Corps; former Editor-in-Chief, American Indian Law Review; President and Executive Director of the Native American College Preparatory Center; and author of dozens of articles, notes, and book reviews relative to the history of American Indian people in America.

Fairbanks, after looking back at these sets of trials and after examining the present situation on Indian reservations, recently stated:

*The Minnesota Chippewa Tribe in 1997: A new beginning, or the beginning of the end?*

1996 was a benchmark year in the history of the Minnesota Chippewa Tribe due to federal felony convictions of longtime political leaders at Leech Lake and White Earth Reservations. * * *

More than just revealing **far-reaching and entrenched corruption in tribal government**, the convictions and post-conviction events at Leech Lack and White Earth reservations and within the Tribal Executive Committee of the Minnesota Chippewa Tribe **expose the fragility of the tribe's claim to sovereignty.** The tribal body politic, if some measure of sovereignty is to be preserved, can no longer afford to ignore the wrongdoing of their political leaders.

### Political Aftermath

At Leech Lake the convictions did little to rid tribal government of the clutches of unscrupulous tribal officials. * * * To stymie * * * reform efforts, they have held numerous illegal tribal council meetings, passed illicit legislation and wasted untold amounts on attorney fees. The result has been governmental chaos and an **expose of the depth of corruption** in Leech Lake government.

\* \* \* \* \* \*

Furthermore, the action, or more correctly the lack of reaction, of the Minnesota Chippewa Tribe Tribal Executive Committee to the federal convictions of four of its members * * * **suggests tribal corruption extends beyond those convicted.** * * *

[T]he nonfeasance of the executive committee **reveals a pervasive political ethic of criminality within the leadership of the Minnesota Chippewa Tribe.** It is, indeed, remarkable that at their federal sentencing hearing [convicted tribal officials] refused to accept personal responsibility for their wrongdoing. Instead, they chose to blame others for their downfall, including the disingenuous argument that the federal government was at fault. They argued that the federal government was responsible because it created the business committees and, therefore, made it possible for them to lie, cheat and steal. By making this silly argument, they revealed their lack of character and personal criminal ethic.

\* \* \* \* \* \*

### Sovereignty Endangered

The Minnesota Ojibwe will soon learn that the American people will not toler-

ate, and continue to finance, such political bungling. The postconviction political events, coupled with the fact that the Minnesota Ojibwe have lost almost all their land and very few remember the Ojibwe language, argue strongly for the conclusion that the Leech Lake and White Earth Ojibwe, and other similarly situated Minnesota Chippewa Tribe reservations, **do not possess the capacity of sovereign political personalities.** In fact, they are in grave danger of losing the scintilla of government they have remaining.

\*    \*    \*    \*    \*    \*

However, before any significant constitutional reform can be achieved, the Minnesota Chippewa Tribe body politic must accept the fact that **the tribe lacks any reasonable measure of inherent sovereignty.** In fact and law, the tribe is a creation of the federal government under the Indian Reorganization Act of 1934 and can be abolished by the plenary authority of Congress at any time. The federal government, of course, can insidiously decide and quodlibet to the contrary by merely reducing, or eliminating, federal funding of tribal programs. **Denying political reality will not foster constructive constitutional reform.**

Robert A. Fairbanks, *The Minnesota Chippewa Tribe in 1997: A new beginning, or the beginning of the end?*, Native American Press, Dec. 27, 1996, at 6 (emphasis added).

I recognize that two out of eleven is a small sampling to draw hard and fast conclusions from. But I will also state, on the other hand, that if in a small, sparsely populated county in Minnesota, approximately 20 percent of the mayors and city councils in cities in that county went through a trial that determined theft, fraud, kickbacks, swindle, corruption, and vote rigging had been in place in those towns for years, it goes without saying that the citizens of those towns, the area legislative representatives, the state attorney general's office, and the state auditor's office would set their teeth and grimly determine to find out how those conditions existed for so long.

You see, the guilty verdicts in those two sets of trials were not about a single act or two of spontaneous theft or embezzlement. The guilty verdicts were not about in-state residents defrauding out-of-state strangers over the telephone. Rather, the evidence and the guilty counts showed a pattern of years and years of corruption, and the evidence forming the basis for the convictions proved beyond a reasonable doubt that defendants were stealing from **their own people.**

All persons found guilty are and remain human beings, brothers and sisters to the rest of the state. The unaccountability they took advantage of is a direct result of the presently held view of "sovereignty," a view that denies to state officials the right to investigate, protect, and regulate their own citizens living on Minnesota reservations.

All elected officials, state and federal, executive, legislative, and judicial, must shoulder their respective share of the shame stemming from the institutionalized neglect of Indian people. Due process and justice demand an immediate move toward formulating sound public policy to ensure this never happens again.

We have stretched the law, contorted it, and tortured it to promote the view of "sovereignty" that tribal governments or reservation business councils want as "the law." This has taken us to depths that could not be fathomed for any other racial, ethnic, or cultural group in this country.

The case of *Cabazon Band of Mission Indians v. County of Riverside*, 783 F.2d 900 (9th Cir.1986), which needs to be read thoroughly, not just cited, and then thoroughly understood, is puzzling. Carried to its logical extreme, it could be renamed "The Indian Gaming and Reservation Nonaccountability Act." Briefly, the Cabazon Band resides in California. California for years had various forms of gambling, but under control of its state legislature and its state courts. If the *Cabazon* court had said that if California Indian people were being prevented by reason of their race from participating in California's regulated forms of gambling, that is constitutionally improper, it would be a wonderful and clear decision and the court could have stopped there. But the *Cabazon* court

went on to expand and give the *Cabazon* tribe gambling unregulated by the State of California. *Id.* at 903. Unregulated gambling is a type of gambling the State of California **never gives to its own residents.**

When Cabazon members gamble off the reservation, state regulations apply. When they gamble on their reservation, state regulations do not. Yet the Cabazon band members are residents of California in both places.

*Cherokee Nation v. State of Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), and its progeny, like *Cabazon,* further increase the isolationism and the red apartheid that is now separating American Indian people from all other cultures and races. That apartheid cannot be justified on the grounds that lack of accountability and "self-determination" and "self-governance" is good for Indian people, and thus, we will close our eyes to constitutional improprieties. The lack of state and federal constitutional guarantees make today's life on reservations intolerable to Indian people who are not on the good side of the reservation business council; they have no practical recourse to state or federal courts when they are on the "bad side." They have learned about their own "tribal courts."

*Cherokee Nation* needs our attention because it is the seminal case defining Indian tribes as "domestic dependent nations" and describing their relationship to the United States as "that of a ward to his guardian." The majority opinion delivered by Chief Justice John Marshall describes the issue:

> This bill is brought by the Cherokee Nation, praying an injunction to restrain the State of Georgia from the execution of certain laws of that State, which as it is alleged, *go directly to annihilate the Cherokees as a political society, and to seize, for the use of Georgia, the lands of the nation which have been assured to them* by the United States in solemn treaties repeatedly made and still in force.

30 U.S. (5 Pet.) at 15 (emphasis added).

The Supreme Court sets out the standing of the United States to its Indian people, and discusses how "they look to our government for protection."

> Their relation to the United States resembles that of a ward to his guardian.

> They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the President as their great father.

*Id.* at 17.

The Supreme court then points out that *if* they wanted to hear the petition of the Cherokees, it would certainly be a great idea for the Court to address the listed grievances.

> If the courts were permitted to indulge their sympathies, a case better calculated to excite them can scarcely be imagined.

*Id.* at 15.

Among the listed bill of particulars by the Cherokees, including a claim that the State of Georgia was unilaterally breaching previously signed treaties, taking the Cherokee's land, and expelling them out of the state, one specific bill of particular is remarkable. It is remarkable because petitioner Cherokee Nation set out, with no dispute, that one of their members had been sentenced to death by hanging by the State of Georgia, and after the Chief Justice of the Supreme Court signed a "writ of error" forbidding the execution, the State of Georgia went ahead and executed Corn Tassel, Georgia stating that "this was no business of the Supreme Court of the United States."

> The individual called in that bill Corn Tassel, and mentioned as having been arrested in the Cherokee territory under process issued under the laws of Georgia, has been actually hung, in defiance of a writ of error allowed by the Chief Justice of this court to the final sentence of the court of Georgia in his case. That writ of error having been received by the governor of the State was, as the complainants are informed and believe, immediately communicated by him to the Legislature of the State, then in session; who promptly resolved, in substance, that the Supreme Court of the United States had no jurisdiction over the subject, and advised the immediate execution of the prisoner under

the sentence of the State court, which accordingly took place.

*Id.* at 12–13.

This listed "grievance" is remarkable because I cannot find at any time in any of our 50 states that a state execution has ever taken place in direct defiance of the United States Supreme Court. It is also remarkable that from the opinion it is apparent the Supreme Court acted no further against the State of Georgia, rather than to note what happened.

The majority opinion further discusses in detail how Indian tribes are **not** the equivalent of a foreign Sovereign Nation.

> [Y]et it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations.

*Id.* at 17.

Then the majority concludes with the holding of the case, which is, that if wrongs had been afflicted, and if even greater wrongs for Indian people are on the horizon, the Supreme Court is not able to lend a hand at this time.

> If it be true that the Cherokee Nation have rights, this is not the tribunal in which those rights are to be asserted. If it be true that wrongs have been inflicted, and that still greater are to be apprehended, this is not the tribunal which can redress the past or prevent the future.

The motion for an injunction is denied.

*Id.* at 20.

*Cherokee Nation* is a real case and it sets out two important truths. The first truth is that on the narrow legal issue of whether federally-recognized tribes are the equivalent of a true Sovereign Nation like Canada or Mexico, it is clear that they are not. All of *Cherokee Nation*'s progeny, from the date of its release to 1997, continue to reiterate that Indian tribes are under the will and defeasance of Congress and that Congress has total "plenary power" over tribes.

The second truth to be taken from *Cherokee Nation* is that from that day to today, the federal government has engaged in a failed Indian policy; partial failure at times and total failure at others, but *always* a failure, because both before and after 1924 when the American Indian was finally accepted as an American citizen, the American Indian has never been extended all the rights, privileges, and obligations of statehood and American citizenship. Right today, the rights, privileges, and obligations of the Constitution of the State of Minnesota and the U.S. Constitution are not guaranteed to Indian people domiciled within the boundaries of Minnesota's Indian reservations.

In attempting to reconcile the different descriptions of Indian tribes in the many federal cases that, like *Cabazon*, at times carelessly use the terms "sovereignty," "semi-sovereignty," "domestic dependent nation," and "ward of the government" interchangeably, hard-working trial judges and appellate judges throughout this state are now caught in a cross-fire, with everyone struggling to do the right thing.

Clear example. Cases are starting to flood our courts over which driving laws and safety statutes of the State of Minnesota can be enforced on Indian reservations. That has broken down into near illogical subgroupings, such as: severity of transgression; those living on reservations; those driving onto reservations from the outside; those driving from reservations on to public roads, etc. These contorted subgroupings are sucking us into the black swamp of internal inconsistency.

I am describing the "criminal/prohibitory" dichotomy versus the "civil/regulatory" analysis laid out in *State v. Jackson,* 558 N.W.2d 752 (Minn.App.1997); *State v. Stone,* 557 N.W.2d 588 (Minn.App.1996); *Bray v. Commissioner of Pub. Safety,* 555 N.W.2d 757, 760 (Minn.App.1996). All three panels have struggled to do the right thing, some finding that certain illegal driving conduct is civil/regulatory and some finding that certain illegal driving conduct is criminal/prohibitory.

With no other race, creed, or culture would we spend a minute struggling to find distinctions that do not exist on an issue so serious as the right of state residents, Indian and non-Indian alike, to expect that all other

drivers they meet are bound by our state's motor vehicle safety laws.

Here is the simple honest answer: The State of Minnesota does not regulate drunken driving, it prohibits it. The State of Minnesota does not regulate speeding, reckless driving, or careless driving, it prohibits them. The State of Minnesota does not regulate driving without insurance or driving without up-to-date registration and current license plates, it prohibits them. The State of Minnesota does not regulate driving without a license, it prohibits it. The State of Minnesota does not regulate failure to have a child restraint, it prohibits it.

The State of Minnesota regulates **legal** conduct. It prohibits **illegal** conduct. Clear example. A highway with a posted speed limit of 55 miles per hour. The state regulates driving conduct up to 55 miles per hour. That is legal conduct. Over 55 miles per hour you are not regulated, you are prohibited. If on that road the county or the state is doing some work and establishes a construction zone with a sign that says "temporary speed limit 40 miles per hour," legal driving conduct up to 40 miles per hour is regulated. Driving conduct over 40 miles per hour is no longer regulated, it is prohibited. The state regulates driving with the minimum amount of liability insurance, 30/60. If you have that or more, you are legal and you are regulated. If you have less than 30/60 limits, or none at all, that driving conduct is not regulated, it is prohibited.

Everyone in the judiciary tries its best to be ethical and fair. The inconsistent swamp we are in is a direct result of incongruous spinoffs of "tribal sovereignty" and "tribal immunity."

The cases coming before the court on the issue of sovereignty are coming from Minnesota's eleven Indian reservations. Appellant has placed sovereignty in issue. I have accepted appellant's request to address sovereignty. Appellant's attorney has every ethical right to promote his client's interests and to put at issue whatever he feels he must do to protect his client's interests. I have an obligation to give the attorney and his client my answer and my legal analysis.

It is helpful to start with the status of Minnesota's eleven recognized reservations, seven Anishinabe/Ojibwe, and four Dakota Sioux. Although they range in size from under 100 acres in southern Minnesota to thousands of acres in northern Minnesota, they contain as residents an extremely small percentage of our population. The most recent figures available show approximately 12,000 Indian people spread out in those eleven different reservations. The four Dakota Sioux are small in size and small in number. Their combined residency is about 1500. The other approximate 10,500 Minnesota Indians living on reservations are spread out among the seven northern Minnesota Ojibwe reservations. Actual populations on reservations range from under 200 to perhaps 3,000. There are a total of approximately 60,000 identified American Indians in the State of Minnesota. The other approximate 48,000 do not domicile on a reservation but reside in all other parts of the state where the Minnesota Constitution and the United States Constitution, with its Bill of Rights, control their rights and privileges and their obligations. *If they go back to the reservation, they are stripped of those guarantees. If they leave the reservation again, those guarantees come back to protect them.*

The eleven reservations have a total of 17 exclusive gaming franchises, including 16 Las Vegas style casinos, some large, some small, and one bingo franchise. Because there is no open meeting law, because there is no freedom of the press, because there is no forum to change that, Indian casino interests keep the total gambling revenues on Indian reservations hidden as much as possible from tribal enrollees and from the public eye.

Although the actual figures are kept hidden by the reservation business council and their casino managers, we know from various sources, shop talk, publications, and comparisons to known figures from regular casinos of similar size, that the money pouring into the 17 Minnesota Indian gaming franchises is substantial.

It can be said that their combined "handle" is between 2.5 and 3 billion dollars annually. "Handle" or "drop" is the total amount wagered. Then we know that the range of cash

back or payout to customers is within the range of 80 percent to 90 percent of that amount. Thus, the amount of cash retained by the casinos called gross profit would be approximately 250 million to 300 million at 10 percent in retainage, and 500 million to 600 million at 20 percent retainage. That figure represents gross profit, a rather loose term, but a sufficient one for these computations. Then from gross profit must be subtracted the costs of doing business to arrive at the net profit. Well-managed gaming casinos historically enjoy an excellent ratio of net profit to gross profit. That, simply and with no further explanation, explains the billions and billions of dollars poured into Las Vegas style casinos in Nevada, in New Jersey, and now in Indian casinos dotting this country since the 1940s. The net profit margin can be as much as 50 percent. Thus, simple arithmetic from the above range of gross profits shows a possible combined net to the 17 franchises of some 100 to 200 million dollars on up through 250 to 300 million per year. That is a lot of money.

South Minneapolis, between Franklin and Lake Street, has one of the largest urban Indian populations in this country. They belong primarily to Minnesota's Dakota and Ojibwe reservations. They know nothing of these figures. Some may receive a small pittance; most receive nothing. Their life is a struggle for survival. They do not know of, much less discuss, *Cherokee Nation,* 30 U.S. (5 Pet.) 1, *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903), *Cabazon,* 783 F.2d 900, *Gavle v. Little Six, Inc.,* 555 N.W.2d 284 (Minn.1996), etc. They are mostly concerned with getting through the day, getting enough to eat, and having a warm place to sleep. They assume that social justice for Indian people, like all important matters, is somehow handled by men and women in tailored suits going quietly to and fro in the executive, legislative, and judicial branches, talking about important things with each other in marbled halls and paneled chambers.

There are people out there on reservation business councils, and their advisors, intimately connected to the management of that tribe's casinos, who know far more than I the

truth and accuracy of my approximations. Anyone wishing to come forward in a public forum and on a public record and correct me as to whether I am high or conservative would provide a relief to me and to Indian people. Then all would know the exact figures. All city residents with a well-managed and state-regulated municipal business entity know exactly how much belongs to them. This is simple and can be done. It occurs, dozens of times, hundreds of times per year in this state, as all cities, villages, unincorporated townships, etc. maintain carefully calculated and open financial records for the residents and all appropriate state agencies that are entitled to examine those records. It is done by employing, as a normal cost of doing business, an outside and fully objective and independent major accounting firm to do a complete and thorough certified financial statement.

In Minnesota, like in other states, whether you are a for-profit corporation, a nonprofit corporation, or a municipal corporation running a business entity, you are subject to applicable state and federal laws and regulations. That ensures accountability of the owners, investors, managers, officials, and residents of the towns involved. The one exception in Minnesota is tribal government. Yet in Minnesota, all members of a tribe, whether living on or off the reservation, are full-blown Minnesota residents and American citizens.

For now, fair and full public disclosure of casino and other tribal government proceeds is denied to all Minnesota Indians, whether they are off-reservation enrollees or reside right on the reservation 100 yards away from the casino that they are told "belongs to them."

If in Minnesota, eleven small towns totalling approximately 12,000 residents had within them 17 different gaming casinos, all would be well in those towns. With state regulation and the laws controlling a municipality's accounting for its revenues, I suggest city planners from towns in Minnesota and other states would make yearly pilgrimages to those casino towns to get city planning and lifestyle ideas. Instead, we have a situation on our eleven reservations where there

is still poverty, illiteracy, inadequate medical care, crime, violence, alcohol abuse, drug abuse, domestic abuse, sexual and physical assaults, lawlessness, incest, and all the other societal ills that plague small towns and large cities.

On Minnesota reservations, even those with the potential for vast revenues, there is a "poverty of the spirit" that no amount of money can salve. *See* Mark Aamot, *Greed vs. Culture?*, The Circle, Feb. 1996, at 5. The article refers to the reservation the smallest in size, but the richest in revenues, the Shakopee Dakota Community with its Mystic Lake Casino. The article details how on a reservation with the most lucrative casino, culture and togetherness get drowned in the fight for control over the money.

My concurrence is decidedly not anti-casino gambling and for those who have read my dissent in *Cohen*, 543 N.W.2d at 382–408, they will know this is true. What I am pointing out is the tragic mismanagement of what should be a legitimate bonanza for Minnesota Indians, previously impoverished for decades. **This tragic mismanagement flows directly from the failed governmental Indian policy of "sovereignty."** The simple but institutionalized change which is necessary, and must be done quickly, is for the federal congress, federal judiciary, state legislatures, and state courts in some fashion to confer full rights of statehood on residents of Indian reservations. When the casinos are located within a Minnesota municipality with all the attendant rules and regulations and open government laws required by that designation, the people will be guaranteed the right to know what those proceeds are. The way it is today, they do not, and are deliberately kept in the dark by the reservation business councils and casino managers.

There are many examples in Minnesota of the proper handling of money by municipalities. For decades, municipalities have owned municipal liquor stores, waste and sewer treatment plants, public utilities, garbage disposal companies, and other businesses. There is nothing wrong with a Minnesota municipality making money at a municipally-owned enterprise. Properly accounted-for dollars help the quality of life by supporting needed services without adding to the tax load.

Even though there are significant gaming revenues, Minnesota and federal taxpayers still are asked to supply to Minnesota reservations with such things as HUD housing, Bureau of Indian Affairs-financed reservation schools, Indian Health Service, AFDC benefits to those who qualify, and other benefits. Each of the above-enumerated uses of taxpayer funds for appropriations for people living on reservations is ethical and appropriate. The people living on reservations share exactly the same class as myself, all readers of this opinion and all residents of this state. The class is Minnesota residents and United States citizens. It has always been permissible to target groups within this state that need legitimate financial aid and then give it to them.

But the gambling money must be accounted for. That is so in Minnesota towns and villages; that is so on federal enclaves, of which Indian reservations are a type. For instance, on military reservations, the profits, whether lucrative or modest, from commissaries, post exchange stores, etc. are subject to rules, regulations, and accounting. The budget of Congress and the Oval Office is a public record.

The majority of Indian casinos in Minnesota and in this country have failed to comply with the federal gaming act which is supposed to regulate them.

This week the National Indian Gaming Commission (NIGC) released a copy of the Report to the Secretary of the Interior on Compliance With the Indian Gaming Regulatory Act (IGRA) by the nation's tribal casinos. The Report, which was dated September 30, 1996, found that only 32 of the country's 274 tribal gaming operations complied with all eight requirements of the IGRA.

As far as Minnesota is concerned, the Report found that only six of the state's 16 tribal casinos were in full compliance with the Act

William J. Lawrence, *Most Casinos in state, U.S. failed to comply with federal gaming*

*act,* Native American Press, Dec. 20, 1996, at 4.

Appellant here, Jackpot Junction, is included on the lengthy list of tribal gaming operations not in compliance. This article stated:

The Report cited the 11 other tribal casinos for the following violations:

Jackpot Junction Casino, owned and operated by the Lower Sioux Indian Community, for failure to be licensed by the tribe and for failure to submit audits to NIGC * * *.

*Id.*

Thirty-two out of 274 is not even enough Indian gaming casinos in compliance in this country to construct an accurate model of how it should be done right!

The following truth must be noted. The hundreds of millions of dollars per year generated by the casinos are not even split fairly among the approximate 60,000 Indian people in this state. Only a tiny few of the 48,000 off-reservation enrollees ever share in any per capita distribution by the reservation business council of net gambling proceeds. Those tiny few off-reservation enrollees who share only got their share after finding themselves pitted against their own tribal leaders who resisted such sharing, and after bitter struggles in federal court. Other than those tiny few, the approximate 48,000 off-reservation but bona fide enrollees get nothing from the proceeds of their tribes' casino income.

What happened to the gross and net revenues from those 17 gambling franchises that I described above? The answer lies in the two previously-described sets of trials from northern Minnesota reservations with casinos. Those casinos were "managed" under the presently held view of "sovereignty." Thus, the total unaccountability and the resulting criminal convictions happened. The results of those criminal trials will forever stand as a public record in mute testimony to the utter failure of present American Indian policy.

Those trials had tragic results for all state residents, Indian and non-Indian alike. There is no triumph, only sadness, in my description of what happened. But federal trials are a matter of public record, open to all, and judicial opinions rightfully can refer to public documents when appropriate.

It is only the "intelligentsia" that Einstein referred to that neither understand nor accept the truth in Indian country. As I previously stated, tribal government leaders, their advisors, and the casino managers know far better than I or anyone else the true figures as to the flow of money. Tribal governments know that the "winds of change are coming." The two sets of previously-described public trials, together with the intensive investigation preceding them, have put tribal governments on notice that the end of total unaccountability to their own people is coming.

There are four distinct sets of outrage. The first outrage belongs to Indian people living on reservations. They have no state or federal constitutional guarantees, no open records as to casino money, no state regulated open and honest elections, no Minnesota state auditor, no secretary of state, and no state attorney general to look over the shoulder of government leaders as is done in all other Minnesota towns.

The second outrage belongs to Indian people enrolled in a tribe but living off of the reservation. They are often ineligible to run for tribal government office, they have no guarantee that their absentee ballots are counted correctly, they have to fight for a piece of the per capita distribution or get none at all, and they have no input in how the tribal government spends money on their reservation.

The third outrage belongs to state residents, Indian or non-Indian, who cannot walk onto a reservation and feel safe on any part of the reservation, including, but not limited to, the gaming casino because city, county, and state law enforcement authorities are hamstrung most of the time, and forbidden some of the time, from even attempting to enforce state laws that promote the safety and welfare of people on reservations. State residents, Indian or non-Indian, cannot even sue a tribal casino for serious injuries that the plaintiffs claim were caused by the casino's neglect.

The fourth outrage belongs to Minnesota and American taxpayers who are expected to

fork out millions of tax dollars a year for various support services for people living on Indian reservations and then are denied the normal accounting we get from state government and the federal government as to annual budgets.

To further add to the misery of Indian people, rightfully entitled to a fair accounting of gross and net profits from their casinos, but not getting it, is the growing probability that when Minnesotans and others who gamble fully realize the total lack of protection they have once they step inside a casino, the number of those coming to gamble will decline. Then the casinos will begin to sink financially and may eventually close. The specter of competition is here.

Clear example. Assume that the State of Minnesota authorized a Minnesota municipality or a private group of investors to build a large and comfortable Las Vegas style casino somewhere in central Minnesota or in the Twin City metropolitan area. It is a matter of public record that for the last few years various state legislators have discussed openly whether there should be state-based or privately-owned gaming in direct competition with reservation casinos. No one can discount this possibility.

Now assume that after state and region-wide publicity, this new Minnesota casino opened, and as eager and curious patrons came through the front door on opening day, they were met by a huge, neatly lettered, painted sign above the door with individual paper copies for all who entered. Assume the sign above the door said the following:

### ACCOUNTABLE CASINO

Welcome to Minnesota's first and only accountable casino. The management hereby makes the following pledge to all customers, all employees, and all individuals and business entities that do business with us:

We understand that we are subject to the United States Constitution, its Bill of Rights, the Minnesota Constitution, and all lawfully passed Minnesota, state and local, legislation or ordinances that affect our right to do business. We agree to be bound by state and federal laws, including without limitation, civil rights acts, laws protecting veteran's preference, OSHA, social security withholdings, workers' compensation, laws against age, race, color, and gender discrimination, zoning ordinances, labor rights to attempt unionization, and all other such matters.

We reserve the right to vigorously defend on the merits any charge against us or our employees wherein it is claimed we are civilly or criminally liable. But we understand fully and accept that we are under the lawful jurisdiction of all law enforcement agencies. That includes, without limitation, city police, county sheriffs, the resident county attorney, the attorney general of the State of Minnesota, and all other agencies and sub-agencies of the State of Minnesota that regulate business enterprises, including those of this type.

We fully understand and agree to unqualifiedly submit to the jurisdiction of Minnesota state district courts and its appellate process, and Minnesota federal district courts and their appellate process when state or federal issues arise. We reserve the right to any and all legitimate defenses, including without limitation the normal qualified immunity involving discretionary decisions of duly elected council members. We reserve the right to attempt to move causes of action wherein we are sued from state court to federal court or from federal court to state court if our attorneys advise us that we should do that to protect our interests. But we agree that we are required to defend on the merits in either a state and federal court.

We pledge not to take money from this casino and set up a system wherein we set the qualifications for and control the selection of "judges" paid by us to entertain lawsuits by others against us.

Our defenses to lawsuits will include, without limitation, defenses on the merits on such matters as statutes of limitation, collateral estoppel, laches, etc.

It is our intention to make a fair profit from this casino for our shareholders if we are privately owned, and for residents of

this municipality if we are a municipal corporation. But we will not do so at the expense of your dignity and rights. We will not cheapen our own by so doing. If we are a privately-owned casino, our books will be open to the appropriate taxing authorities, state and federal, and all income taxes, excise taxes, sales taxes, etc. collected will be paid to the appropriate authorities. If we are a municipally-owned business, we understand that we are subject to open meeting laws, freedom of the press, display of all of our public records to our residents at appropriate times, and all other laws regulating municipally-owned businesses.

We accept the authority of the State of Minnesota, through its State Auditor, to examine our books as required.

We accept the authority of the State of Minnesota, through its Secretary of State, to monitor and regulate our municipal elections so that all qualified voters have their votes counted fairly.

If there are any allegations against us, civil or criminal, we reserve the right to hire attorneys to defend us. But we understand there will be an independent judicial forum for the respective claims and defenses to be heard.

If the above were the case, it would not be long before the seventeen Indian gaming franchises would suffer financial distress, and then close, one by one.

There is nothing "anti-casino" in what I say. I am "anti-anything" that runs to the detriment of the people it is supposed to serve. If there are to be Indian gaming casinos or other tribal business enterprises, I am for healthy, regulated, accountable casinos and other businesses run by properly elected public officials, under Minnesota state laws regulating municipalities. Nothing bad can happen from the change that I suggest must come, meaning the change from "federal tribal enclaves" to Minnesota municipal towns, villages, or cities, whatever form is chosen. The present existing gaming casinos have "grandfather" rights. It is just that the gaming casinos need to be operated like all other municipally-owned business entities, open, accountable, and subject to Minnesota's laws on open meetings and open public records.

The foundation of the myth of sovereignty and its concomitant evils is that **the federal government has never entrusted American Indian people with the ownership of reservation land.** This is unlike any other race, color, or ethnicity. It is time. Reservation residents must be given the right of ownership in fee simple. Since 99 percent plus of Americans have this right, the tiny percentage of Americans living on reservation land are being discriminated against to the full extent of the law. There is somewhere between perhaps 600,000 to 900,000 Indian people in this country actually living on the 554 scattered federally-recognized reservations. All Indian people living off the reservation can own land in fee absolute. A tribal government can do little or nothing without the approval of a federal agency, some arm of the federal government. Indian people, generally, living on a reservation cannot. This prohibition applies whether it is called reservation land, trust land, or allotted land. It may be "deemed to be the tribe's," but it lacks the pure ownership indicia of fee simple absolute.

This will take federal congressional action and the guidance of the federal judiciary, but I am setting out the reasons why it has to be considered, and considered quickly.

All municipal governments in this state and country own land, as do their residents, in fee simple. Many municipalities have valuable land, including but not limited to lake front property, riverfront property, commercial land suitable for private investors to buy and develop, etc.

The *Cherokee Nation* nineteenth century, antiquated, questionable, and patronizing "government/ward status" continues to keep Indian people on reservations in a tribal state of dependency on either state and federal handouts or expansion of the increasingly unaccountable gambling. *See Cherokee Nation*, 30 U.S. (5 Pet.) at 17 (noting that tribes' "relation to the United States resembles that of a ward to its guardian").

Give them their land! Without ownership, there is no chance of attracting home owners and businesses.

If Indian reservations are reorganized as standard Minnesota cities and towns, the flight of Indian people off their reservations to the "free part" of the state will be halted, and hopefully reversed. Today, 75 percent to 80 percent of all enrollees in Minnesota have turned their back on reservation life because of tribal politics, unaccountability, institutionalized nepotism, and fear. On the other hand, as a normally regulated town under Minnesota laws and Minnesota courts, professional and white collar people of Indian descent might consider moving back to the reservation. Now, because of the inability to buy or build a home, because of the questionable quality of reservation schools, because of the total lack of job security (even for those hired by tribal government as advisors), because of the lack of a stable state-regulated police force, even those pretending to adhere to the security blanket of "sovereignty," choose not to live as permanent residents on the reservation. If you ask them point blank, "Why not?" their moment of awkward silence will be the truth.

When you examine the status of Indian people today, it is clear that even after the 1924 passage of what can be called the American Indian Citizenship Act, see Act of June 2, 1924, 43 Stat. 253, now codified at 8 U.S.C. § 1401(b) (1994), acceptance of American Indian people as individuals, endowed with every right to individually demand the benefits of a state constitution and the federal constitution, **has never been granted by the United States Congress or mandated by the United States Supreme Court.**

Under the pretense of "sovereignty," we deny Indians living on reservations the most basic rights given all other Americans, the right to own land and the rights, privileges, and obligations of state constitutions and the federal constitution. Instead, the federal government holds reservation land "in trust" on behalf of the Indians. *Oklahoma Tax Comm'n v. Texas,* 336 U.S. 342, 355, 69 S.Ct. 561, 568–69, 93 L.Ed. 721 (1949) (stating that the "allotted Indian lands held in trust by the United States [are] 'an instrumentality employed by the United States for the benefit and control of this **dependent race.'**") (citation omitted, emphasis added.)

Many Indian reservations in this country are small. Some consist of a few hundred acres or less. Some consist of a few thousand acres. A few reservations, particularly in the western states, comprise a few hundred thousand acres or more. The Navajo reservation, occupying parts of two states, New Mexico and Arizona, and the Crow reservation in Montana would be two examples of our larger reservations. We need not be afraid to give these tribes and their people land ownership of hundreds of thousands of acres in fee absolute. If the reservation boundaries contain that much land now, all that means is that before various federal agencies, and the U.S. War Department, acting under the control of Congress, stole Indian land and then set the reservation boundaries, the Indian people thereon owned millions of acres! When we established reservation boundaries and forced Indian people within those boundaries, we always downsized their former holdings, we never "upgraded."

The present reservation system **preserves isolationism and red apartheid.** From 1619, when the first slaver hit America's eastern shores, until 1863, when Lincoln proclaimed the Emancipation Proclamation, we had slavery, pure and simple. But after emancipation and quick passage of the Thirteenth, Fourteenth, and Fifteenth Amendments, no thought was given to appropriating lands from the defeated South and handing them over to American blacks and telling them to set up their own "plantations/reservations," where as long as they stayed within the borders they could pretty much do what they wanted, pretty much elect who they wanted to, and those elected could pretty much do what they wanted to anybody within the boundaries.

We did not force now full-fledged American black citizens onto "plantations/reservations." But both **before and after 1924** and passage of the American Indian Citizenship Act, we forced Native people to live on reservation/plantations to enjoy the benefit of "sovereignty." We say to no other race,

color, or culture, "you are free to leave the reservation and step into the free part of the state where the state constitution is in force, but the second you step back across the line, state and federal constitutional guarantees, and the right to own your own land, disappear."

America's history is replete with both subliminal and overt nonacceptance of Indian people. *See* "Indian Wars of the Nineteenth Century." By my use of the word "nonacceptance," those living who were involved in a direct or peripheral way with the legal analysis leading to *Brown v. Board of Education*, (and anyone studying the history of that case) will recall that the nonacceptance of colored children in all white schools was testified to at length in various public records as being so dysfunctional, so destructive of normal hoped-for emotional adolescent growth patterns, that by starting with the emotional and psychological sickness suffered by colored children, the grown-ups finally said, "there ought to be a law against it." 347 U.S. at 483, 74 S.Ct. at 686.

They should have paid attention to the little children far earlier. These same patterns of arrested development and psychological disability from nonacceptance plagues not just the young, but all Indian people domiciled on reservations.

As we pushed westward in the 1900s and took over Indian land and called it federal territories, then accepted those territories as states, after referendums, all persons in that former territory had a right to be a resident of that state, all **except the Indian people** who, during the westward push, had been physically herded onto reservations. As residents of any county in Minnesota, off-reservation enrollees have far more "self-determination" and "self-governance" than anyone living on an Indian reservation. Indian reservations are subject to the "will and defeasance of Congress." They are subject to the "plenary power" of Congress. Off-reservation enrollees and other Americans are not so subject. The Tenth Amendment to the United States Constitution states:

The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states, respectively, or to the people.

U.S. Const. amend. X.

Today, Indian reservations are nothing more than thinly disguised federal enclave "plantation/reservations." Freedom as a state resident and as an American protected by the Tenth Amendment lies off the reservation, not on it.

Off-reservation tribal enrollees can buy and sell a home, buy and sell a business, own land, mortgage it, vote for city, county, and state officials, knowing that the secretary of state monitors those elections. They can demand to review public records at appropriate times. If they feel aggrieved on any cause, the nearest Minnesota district court with venue and jurisdiction will entertain their claim. **They must prove it, but they will have a forum to entertain their claim.**

When the State of Minnesota had virtual sovereign immunity, the Minnesota Supreme Court, at least at that time, had the good sense of social justice to insist that the legislature waive it for legitimate claims of their citizens. In *Spanel v. Mounds View Sch. Dist. No. 621*, the court stated that it was

unanimous in expressing its intention to overrule the doctrine of sovereign tort immunity as a defense with respect to tort claims against school districts, municipal corporations, and other subdivisions of government on whom immunity has been conferred by judicial decision arising after the next Minnesota Legislature adjourns, subject to any statutes which now or hereafter limit or regulate the prosecution of such claims. However, we do not suggest that discretionary as distinguished from ministerial activities, or judicial, quasi-judicial, legislative, or quasi-legislative functions may not continue to have the benefit of the rule. Nor is it our purpose to abolish sovereign immunity as to the state itself.

264 Minn. 279, 292–93, 118 N.W.2d 795, 803 (1962).

The *Spanel* court characterized the doctrine of sovereign immunity as "archaic" and stated that it would overrule it as a defense with regard to tort claims brought against

school districts, municipal corporations, and other subdivisions of government on whom immunity was conferred by judicial decision, arising after the 1963 Minnesota Legislature adjourned, subject to any statute presently, or subsequently limiting or regulating prosecution of such claims. *Id.*

If the doctrine of sovereign tort immunity is archaic as to a state of 4.6 million residents, it is even more archaic to eleven tiny scattered enclaves with a total of approximately 12,000 state citizens living on them. The changeover, from unregulated reservations to Minnesota towns and municipalities, will cause no damage whatsoever to the right of tribal government to continue to make the decision necessary to serve their residents. All Minnesota municipal entities, from the state itself on down to city councils, towns, school districts, etc., share a limited immunity for purposes of those discretionary decisions needed to make and implement sound public policy. *See* Minn.Stat. § 446.03, subd. 6 (1996) (excepting municipalities from tort liability against "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused"); *see also Waste Recovery Co–op. v. County of Hennepin,* 504 N.W.2d 220, 230 (Minn.App. 1993) (noting that "discretionary function immunity protects a governmental act that 'involves a balancing of policy objectives'") (citation omitted).

When they become municipalities, Indian reservations, like all Minnesota towns, will enjoy the same rights, privileges and obligations as do every other governmental entity in this state. But for now they stand out as a glaring exception to the maxim that no person or entity "is above the law."

*Gavle,* 555 N.W.2d 284, is the law and we have to deal with that. Between 1834 and the Emancipation Proclamation, which went into effect on January 1, 1863, *Dred Scott v. Sandford,* 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1856), was the law and we had to deal with that. Between January 1, 1863, and *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, in the fall of 1954, black apartheid was the law and we had to deal with that. Thus, it is permissible to explain existing law to explore its ramifications and see whether appropriate changes should be considered.

The complaint in *Gavle* is a public record and thus can be reviewed by all. The complaint is a 25–page document carefully detailing allegations including, but not limited to, physical abuse, sexual abuse, coercion, terroristic threats, job loss, impregnation, and other alleged abuses. The complaint contains carefully-detailed allegations that several of the claimed torts took place on Mystic Lake Casino property with the knowledge and consent, and at times the aiding and abetting, of casino employees. If you substitute for the named defendant and the tribal corporation in *Gavle,* the governor, attorney general, any constitutional officer, any sitting judge, any state senator, or any member of the house of representatives, and the state agency that employs them, the plaintiff would have a forum to attempt to keep both the defendant and the governmental entity in as a co-defendant. The plaintiff would have an acknowledged uphill battle. There is far more red tape in suing a governmental entity than in suing an individual. This red tape has a legitimate purpose. Governmental entities in Minnesota (and elsewhere) are clothed with a carefully crafted limited or qualified semi-sovereign immunity from certain types of acts. *See* Minn.Stat. § 446.03, subd 6 (1996) (listing specific instances where a municipality may be shielded from tort liability). Discretionary/ministerial, official immunity, discretionary immunity, common law immunity are known examples of how a governmental entity can be shielded from a lawsuit either started against itself alone or when the entity is named as a co-defendant. But in recognition of the need for social justice for its citizens, carefully crafted exceptions are built into the law to allow a plaintiff a due process opportunity to crack the veil of sovereignty. *Spanel* sets out the sound reasoning and logic. 264 Minn. at 292–93, 118 N.W.2d at 803. The point is, no plaintiff in this state is denied a forum to at least argue that they should have a chance to prove they qualify for one of the recognized exceptions. The Gavles of the world are denied an independent forum when the de-

fendant is an Indian reservation's tribal government or their "business arm," a gaming casino.

Between the 1834 release of *Dred Scott* and the 1863 Emancipation Proclamation (followed quickly by the Thirteenth, Fourteenth and Fifteenth Amendments, to complete the concept that no one can be enslaved), slavery as an acceptable American institution, with its attendant evils too numerous to mention, was unexplainable if the goal of the judicial system is justice. In that time frame, slavery was legal; but it remained unexplainable.

Between 1896 and 1954, state-sanctioned black apartheid (the *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting), separate but equal doctrine), with its attendant evils too numerous to mention, was unexplainable if the goal of the judicial system is justice. In that time frame, black apartheid for states that so chose to practice it was legal; but it remained unexplainable.

Today, the result in *Gavle* is unexplainable if the goal of the judicial system is justice. It is legal, based on "sovereignty," with its attendant evils of lack of state and federal constitutional guarantees; its attendant evil of unaccountability; but it remains unexplainable.

If the goal of the judicial system is not justice, then the judicial system becomes unexplainable.

I recognize that justice is guaranteed to no one; but can we consciously, as human beings, deny other human beings the first step, a legal forum, to attempt to invoke justice?

Normally, Minnesota does not leave plaintiffs suing a governmental entity "hanging out to dry" from the outset of a case by stating, "we do not care what your claim of proof may be. You are not entitled to a forum to voice it against us. Go pursue the individual. It is none of our concern."

The City of Minneapolis for the last few years has been hit with a series of lawsuits alleging excessive force by their police officers. The City vigorously defends on the merits. They use every available defense, including their limited sovereign immunity, but they never start the lawsuit by stating, "this is between the plaintiff and the police officer. Whatever the two of you end up doing is your own business."

Minneapolis stands behind the officer with its financial assets. If the plaintiff obtains a judgment against the officer and/or the City of Minneapolis, the City of Minneapolis and its taxpayers honor their commitment. They pay their just debt.

The case before us is about a semi-sovereign tribal government that does not even wish to appear in a state court to present a defense.

I use the term "semi-sovereign" to describe Indian reservations and their tribal government, the reservation business councils. Thus, I need to take some time now and attack a myth, a myth that, like a sighting of "Elvis," you can squelch and bury, but that is resurrected when somehow, somewhere, another individual claims that he has seen "Elvis."

The "Elvis sighting" is a stubborn belief of some individuals, some of the "intelligentsia," that each Minnesota Indian reservation is like a true Sovereign Nation, "a nation within a nation." The backup argument is that members of a reservation enjoy "dual citizenship," dual as in citizens of the United States of America, and citizens of some equivalent foreign independent nation, an Indian tribe.

I can only point out again that none of the normal attributes of a true sovereign nation or a true independent foreign country has ever been attributed to our federally-recognized Indian tribes.

Real sovereignty includes, without limitation, the right to seal one's borders, declare war, make peace, coin one's own currency, design and distribute one's own postage stamps, nationalize essential industries such as radio. telephone, communications, steel, oil nationalize industries belonging to foreigners, control immigration, set quotas, forbid emigration, apply for a seat in the United Nations, etc.

*Cohen v. Little Six, Inc.*, 543 N.W.2d 376, 386 (Minn.App.1996) (Randall, J., dissenting), *aff'd* (Minn. Jan. 21, 1997).

*Gavle* contained the most recent pronouncement of the Minnesota Supreme Court on this issue of whether tribes are true sovereign nations. *Gavle* laid that myth to rest. In pertinent part, *Gavle* stated, "Because we have jurisdiction to hear Gavle's claim, and we choose to exercise it, we now address the issue of sovereign immunity." *Id.* at 292.

First of all, no Minnesota state court would have any jurisdiction over a claim by, for instance, residents of Canada against the Canadian government, a true sovereign nation. Then *Gavle* goes on to say, "It is settled law that tribes have the privilege of sovereign immunity, granted to them by Congress, and **existing at the sufferance of Congress.**" *Id.* (citing *Rice v. Rehner,* 463 U.S. 713, 719, 103 S.Ct. 3291, 3296, 77 L.Ed.2d 961 (1983) (emphasis added)).

All federal cases on this issue have repeated the settled law that tribes are under the will, defeasance, and sufferance of Congress.

Decided in 1831, *Cherokee Nation,* the seminal case on "sovereignty" from which all other relevant cases flow, provides in part:

> Though the Indians are acknowledged to have an unquestionable, and, heretofore, unquestioned right to the lands they occupy until that right shall be extinguished by a voluntary cession to our government, yet it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a **ward to his guardian.**

30 U.S. (5 Pet.) at 16 (emphasis added).

> Actually, *Cherokee Nation* sets the record straight. The case sets out unequivocally that Indian tribes are not true sovereign states or nations. *Cherokee Nation* labelled the tribes "domestic dependent nations." *Id.* at 17. *Cherokee Nation* is accurate when it uses the term "domestic" as, by definition, American Indian tribes

are in the U.S., not a foreign country. *Cherokee Nation* is totally accurate when it uses the term "dependent."

*Cohen,* 543 N.W.2d at 385.

The status of Indian tribes as "sovereign" is purely an artificial creation of Congress. It exists only at the sufferance of Congress and is subject to complete defeasance. *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). In other words, Congress may completely eliminate tribal immunity. Recently, the Supreme Court confirmed that "Congress has always been at liberty to dispense with such tribal immunity or to limit it." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 510, 111 S.Ct. 905, 910, 112 L.Ed.2d 1112 (1991).

*Lone Wolf,* 187 U.S. 553, 23 S.Ct. 216, on treaties is instructive. *Lone Wolf* states, in part:

> The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the *power* to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians.

*Id.* at 566, 23 S.Ct. at 221.

*Lone Wolf* repeats, not the sovereign status of Indians, but their dependent status:

> In one of the cited cases it was clearly pointed out that Congress possessed a paramount power over the property of the Indians, by reason of its exercise of guardianship over their interests, and that such authority might be implied, even though opposed to the strict letter of a treaty with the Indians.

*    *    *    *    *    *

It seems to us that this is within the competency of Congress. These Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States.

*Id.* at 565–67, 23 S.Ct. at 221–22 (citations omitted).

*Lone Wolf* also puts to rest any idea that the land beneath reservations is not United States soil, but rather, is land belonging to a foreign or sovereign nation:

But the right which the Indians held was only that of occupancy. The fee was in the United States, subject to that right, and could be transferred by them whenever they chose. The grantee, it is true, would take only the naked fee, and could not disturb the occupancy of the Indians; that occupancy could only be interfered with or determined by the United States. It is to be presumed that in this matter the United States would be governed by such considerations of justice as would control a Christian people in their treatment of an ignorant and dependent race. Be that as it may, the propriety or justice of their action towards the Indians with respect to their lands is a question of governmental policy, and is not a matter open to discussion in a controversy between third parties, neither of whom derive title from the Indians.

*Id.* at 565, 23 S. Ct at 221.

Preceding *Lone Wolf,* we had *Ward v. Race Horse,* 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244 (1896), telling us:

That 'a treaty may supersede a prior act of congress, and an act of congress supersede a prior treaty,' is elementary. * * * In the last case it was held that a law of congress imposing a tax on tobacco, if in conflict with a prior treaty with the Cherokees, was paramount to the treaty.

*Id.* at 511, 16 S.Ct. at 1078 (citations omitted).

*Lone Wolf* and *Race Horse* tell the truth.

Thus, when federal and state court cases carelessly use the term "sovereign immunity" without taking the time to point out that it is a limited sovereign immunity, limited by Congress, which can eliminate and abrogate

it totally if it so chooses, they keep alive the "myth of sovereignty."

A governmental entity calling itself a "Sovereign Nation," that concedes it is under the will of a higher governmental entity, is not sovereign, but dependent and semi-sovereign. Put another way, "Indian sovereignty" is a classic legal oxymoron.

We are still haunted by John Marshall's brilliant, evasive compromise, whose definition of Indian tribes as "domestic dependent nations" bequeathed a contradiction in terms that continues to confuse our thinking about Native Americans to the present day.

Fergus M. Bordewich, *Killing the White Man's Indian,* at 338 (1996).

What failed federal governmental Indian policy has done is give reservation business councils absolute power when it should only be limited power in line with the limited power of other mayors and city councils within this state.

A last example, if one need be given, was draft resistance by American Indians based on their version of "sovereignty."

As I stated in *Cohen:*

During World War II and the Vietnam War, a test of sovereignty presented itself. Essentially, American Indians raised the issue of whether they were citizens of the U.S. subject to the draft or whether they were sovereign or quasi-sovereign inhabitants of a sovereign or quasi-sovereign reservation and, thus, not subject to the draft. The federal courts listened politely and then ruled immediately that American Indians were U.S. citizens subject to the draft. *See, e.g., United States v. Rosebear,* 500 F.2d 1102 (8th Cir.1974) (holding that induction of Indian, who was United States citizen within the meaning of the Selective Service Act, is not precluded from military service by quasi-sovereignty of Indian nations, lack of full citizenship by Indian people, or treaty commitments); *Williams v. United States,* 406 F.2d 704 (9th Cir. 1969), *cert. denied* 394 U.S. 959, 89 S.Ct. 1307, 22 L.Ed.2d 561 (1969) (holding member of Western Shoshone Nation of Indians subject to Universal Military Training

and Service Act and not exempt by Treaty between the United States and Western Shoshone); *Ex Parte Green,* 123 F.2d 862 (2d. Cir.1941) (holding that even if treaty status between U.S. and Indian tribe were valid, Congressional action superseded the treaties and made tribe member a citizen for purposes of WWII military service); *United States v. Cook,* 383 F.Supp. 353 (N.D.N.Y.1974) (holding that appellant was subject to Military Service Act of 1967 even though a member of Six Nations of Indians). * * *

Sovereignty is a phrase we have mouthed for over 200 years, but this country has never, at any time, treated Indian tribes with any of the courtesy, nor respect accorded a true sovereign state or nation, such as a Canada, Mexico, Great Britain, etc. None of the normal attributes of a true sovereign nation or foreign county has ever been gifted to, or attributed to, Indian tribes. Real sovereignty includes, without limitation, the right to seal one's borders, declare war, make peace, coin one's own currency, design and distribute one's own postage stamps, nationalize essential industries such as radio, telephone, communications, steel, oil, nationalize industries belonging to foreigners, control immigration, set quotas, forbid emigration, apply for a seat in the United Nations, etc.

*Cohen,* 543 N.W.2d at 384, 386.

As stated by Ralph K. Andrist in *The Long Death: The Last Days of the Plains Indian,* 246 n.* (1993):

Actually, there was no writing of treaties with Indian tribes after 1871, when the entire ridiculous pretense that tribes were sovereignties was abolished. It would be pleasant to be able to report that the change was made because common sense prevailed, but such was not the case.

In a 1996 American Indian Law Review article, Robert A. Fairbanks stated in pertinent part:

[R]eservation casinos—the alleged economic salvation of the Native American peoples—are subject to extensive federal regulations and reluctant state acquiescence. Given federal plenary power, Na-

tive American self-determination and sovereignty are illusory.

\* \* \* \* \* \*

The various Native American nations negotiated and executed over three hundred treaties with the United States of America before Congress declared in March 1871 that "no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty * * * *"

Robert A. Fairbanks, *Native American Sovereignty and Treaty Rights: Are They Historical Illusions?,* 20 American Indian L.Rev. 141, 142, 146 (1996).

What the federal government has failed to do with their dependent wards is set up a structure for Indian people that will give them a chance to live in peace and to have the full input into their city council's government and the full force of the state constitution of the state they live in to enforce their rights, both under that state's constitution, and the United States Constitution. That structure is full statehood, meaning entitlement to all the rights, privileges and obligations of being a state resident. That can be accomplished by going through the needed legislation to turn Indian reservations into towns and cities. Many reservations in this country are "checker-boarded." There is some private land within the reservation borders which is owned by an Indian or a non-Indian. Nothing changes for those already holding private ownership. They will simply be residents of a state town within a state county within a state.

To have true dual citizenship, you need **two** independent Sovereign Nations, such as the United States and Canada, England, or France. American Indian people only have citizenship in one true sovereign, the United States of America. Their other "citizenship" is as a dependent ward of Congress when they live on a reservation or other tribal land. In this ward-like status, they do not even enjoy the state's rights that they do the minute they leave the reservation. In reality, reservation-domiciled Native people have one citizenship, American. The other "citi-

zenship" is a black hole containing only a lack of rights, not rights. If you want to give American Indians freedom, give them full statehood. They are "somewhat familiar with being residents of federal enclaves."

As a parallel, the City of Washington, D.C. is a type of federal enclave, like federally-recognized Indian reservations. It is under the power of Congress. It does elect its own mayor and city council members, and they, like all other municipal officials, have the previously described limited or qualified sovereignty in their municipal decision making. But an independent "Sovereign Nation" it is not. Indian tribes are not independent "Sovereign Nations." The residents of the District of Columbia and Congress and any person in this country with a cursory knowledge of the town understands that.

> the District of Columbia, a unique federal enclave over which 'Congress has * * * entire control * * * for every purpose of government.' *Kendall v. United States,* 12 Pet., 524, 619 [9 L.Ed. 1181] (1838). * * * Congress' power over the District of Columbia encompasses the full authority of government, and thus, necessarily, the Executive and Judicial powers as well as the Legislative. This is a power that is clearly possessed by Congress only in limited geographic areas.

*Northern Pipeline Const. v. Marathon Pipe Line Co.,* 458 U.S. 50, 75–76, 102 S.Ct. 2858, 2874, 73 L.Ed.2d 598 (1982).

Yet "enlightened" elected state and federal officials continue to deny the true status of Indian tribes. Why do they insist on putting on the blinders? The answer is, it is a subliminal patronizing racism and they use it to distance themselves from truly accepting Indian people as full-fledged state residents and citizens of the United States of America.

America and Minnesota were in bloody warfare with the American Indian people throughout the entire nineteenth century and parts of the seventeenth and sixteenth centuries. (*See* Dakota Conflict, 1862). The conflict on reservations today is "warfare" between those who want accountability and the protection of state constitutions and the protection of the federal constitution, and those who want to preserve the status quo, since

they hold the reins of tribal government and the purse from the windowless counting rooms of Indian casinos.

For those who wish to continue to pretend that the 554 federally-recognized Indian reservations in this country are separate independent "nations within a nation," I can only point out the obvious. Does that mean to our present 100 senators we add 1108 and several hundred more to the house of representatives? Do we add 554 more state militia or national guards? One recently convicted tribal official on his way to federal prison stated that by the twenty-first century he expected that each tribe should be able to apply to the United Nations for recognition as a foreign nation. That would give the United States not one, but a total of 555 votes in the United Nations. Does anyone really take serious the notion that within the borders of the United States, there are the equivalent of 554 downsized versions of Andorra, Benin, Gabon, Micronesia, Samoa, etc., and some of the other "postage stamp" size countries that have sovereign independence and a vote in the United Nations.

If you want to "Balkanize" this country on the basis of race, culture, and ethnicity, then you should spend some time on the north/south Ireland border, in Israel/Palestine, in India/Pakistan, in Russia/Chechnya, and particularly in Slovenia, Croatia, Serbia, Bosnia, Herzigovena. In former Yugoslavia, just shut up and just listen. Let the dead speak to you before you make your final decision. Go if you want, fight, shed your blood, die if you must. If you survive, then come back and tell us how unifying it is for the United States of America, with its 50 states, to have within our borders 554 tiny "nations within a nation," each claiming their version of "sovereignty" and their version of an "independent tribal court."

In the Time essay for December 30, 1996, Charles Krauthammer observed:

> It is possible that with time our mania for identity politics too will fade, perhaps shamed and deterred by the example of such Balkanized wrecks as Bosnia and Rwanda.

Charles Krauthammer, *Alger and O.J.*, Time, Dec. 30, 1997, at 174.

I agree with the various cases that rationally discuss Indian reservation semi-sovereignty in terms of an issue that needs Congress's attention. But I am tired of blaming the intolerable situation on Minnesota reservations entirely on the federal government. The federal government shares the blame, but states are not helpless as to their own citizens. I am tired of having to name someone as an oppressor every time there is a victim. I am tired of the insufferable politically correct culture of the 1990s which strangles us as a state, and prevents us from addressing the thorny issue of discrimination openly and honestly.

The fifty semi-sovereign states in our federal union are not helpless.

Under the Minnesota Constitution we can give our citizens more rights than under the federal constitution. We simply cannot give less. All states have the same privilege.

A few years ago, the Minnesota Supreme Court gave the old order Amish in Minnesota greater religious freedom than required by the U.S. Constitution. We know that because the Minnesota Supreme Court in *State v. Hershberger*, 444 N.W.2d 282, 289 (Minn. 1989) (*Hershberger I*) specifically exempted the Amish in Minnesota from displaying slow-moving vehicle signs on their buggies (statute requiring display of slow-moving vehicle emblem violated freedom of conscience rights protected by Minnesota Constitution when statute was applied to Amish defendants, who held sincere religious belief against use of emblem, where state failed to demonstrate that both freedom of conscience and public safety could not be achieved through alternative means of Amish defendants' use of white reflective tape and lighted red lantern).

Following *Hershberger I*, the State of Minnesota successfully petitioned the United States Supreme Court for certiorari. The United States Supreme Court remanded *Hershberger* to the Minnesota Supreme Court with a terse message and a cite to one of its original cases. *Minnesota v. Hershberger*, 495 U.S. 901, 110 S.Ct. 1918, 109 L.Ed.2d 282 (1990) (*Hershberger II*) (citing *Employment Div. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)).

When you read *Smith*, it is clear the Supreme Court's message was "Minnesota, rethink how much religious freedom over and above what this court would grant that you should grant." The Minnesota Supreme Court, at least at that time, said "tough," and they wrote *Hershberger III*, preserving the right of old order Amish under the Minnesota Constitution to a greater degree of religious freedom than the Supreme Court felt appropriate. *State v. Hershberger*, 462 N.W.2d 393, 398 (Minn.1990).

None of us can do everything, but each of us can do at least something. Minnesota has a right to look to its own state constitution, to see that the rights of its residents living on reservations have at least the same rights as **Minnesota Indians not living on the reservation.** One of the rights all Minnesotans enjoy is the right following a not guilty verdict in a criminal trial to be forever freed from a "judge" who claims the power to set aside a defendant's verdict of not guilty, render a verdict of guilty, and imprison the defendant.

The federal government not only need not fear state regulation of Indian people and Indian tribes, but must recognize that it is the only way to give Indian tribes true freedom and the constitutional benefits of the Tenth Amendment to the Bill of Rights.

As federal wards since *Cherokee Nation*, they have had their entire country, we call it America, stolen from them by us or bought by us with inconsequential money as a result of mostly unconscionable treaties. The push from the east coast to the west coast was not impeded by the federal judiciary (I can only assume that state judges then felt as helpless as some seem to feel today). The death of Indian people from outright war and genocide, coupled with white man's diseases such as small pox, cholera, whooping cough (diphtheria), and others amounted to millions of Indian people. At one point around the turn of the twentieth century, Indian people came close to extinction.

The federal government and the federal courts cannot possibly micromanage the lives and rights of the 12,000 Indian people in Minnesota living on reservations, nor the others in the other 553 reservations. The sordid history of Indian people from 1787 through 1997 proves that issue. On the other hand, the 75 percent to 80 percent of Indian people who do not live on reservations but live in the free part of their home state have, since 1787, enjoyed all the rights of the United States Constitution and all the rights of the respective state constitutions. The federal government does not micromanage that group, which is the vast majority of American Indian people. The federal government allows them to live as all the rest of us do, as citizens of their respective states.

The federal courts are incapable of micromanaging Indian people on reservations. They do not get involved in the bread and butter legal issues that about 95 percent of life is all about. You see, whether Indian or non-Indian, original federal court jurisdiction over the issues of state residents is fairly rare. Federal courts do not handle divorces, adoptions, family custody, probate matters, buying and selling of homes and businesses, intrastate commerce of business (except bankruptcy), the enforcement of state traffic statutes, and totally state-related crime, and the multitude of other matters that state courts handle. If state courts did not handle the daily lives of its residents, the federal court system would sink under the case load in weeks.

The federal government and the federal courts **always** retain the right to look over the shoulder of the state courts and state legislatures. The federal courts are there to ensure that state constitutions give as many rights as, or more than, the United States Constitution and do not attempt to give less. The federal courts are there to look over the shoulder, for instance, of a state correctional system and put it "on paper" when extraordinary measures are needed. But the only true freedom for Indian people will be when the federal government and the federal courts require state legislatures and state courts to take over the regulation of Indian reservations, just like states regulate all towns and cities within their borders. State legislatures and state courts today are required to regulate the lives of the 99 percent of the citizens in America who do not live on Indian reservations, and that number includes most Indian people.

We fought the Civil war, or the War Between the States, to free black citizens from having to live on plantations. We did not fight the bloodiest war in this country's history to force black Americans onto plantations. Yet today, we have a "reservation system" for American citizens where state and federal constitutional guarantees are not in place, as they were not in place on plantations prior to 1863.

How did we arrive at the above-mentioned anomalies, inconsistencies, injustices, and unaccountability in Minnesota, a state that prides itself on social justice and equality for all?

Part of the answer lies in what has been described as "the noble savage mentality." The Native American Press recently predicted the resistance of the "noble savage mentality crowd" to removal of the "veil" of tribal sovereign immunity:

> Depending upon your perspective in the Native community, Judge Randall's dissent in the Cohen case is either the best or worst thing that could have happened to Indian tribal government since the landing of Columbus back in 1492. Due to the potential magnitude of the impact of this dissent to the current concept of Indian tribal sovereignty we have decided to carry it verbatim on pages 2, 5, 8, 9 and 10 of this edition.

> In his 69 page (legal) dissent, Judge Randall traces the origin and historical evolution of the concept of Indian tribal sovereignty. He calls it "more illusion than real, a Potemkin Village, mush when it was written and mush today and a throw back to the Separate but Equal doctrine, struck down in 1954, by the U.S. Supreme Court in Brown v. Board of Education."

> For a judicial document, the dissent is interesting, thorough, well written and even eloquent at times. It reveals a writer well versed in Indian law, Indian history and Indian culture. For its intrusion into

near sacred tribal ground, it is not without sensitivity and appears to come from the author's heart rather than from any vendetta.

This piercing of, or perhaps more appropriately the great ripping in, the veil of tribal sovereign immunity by Judge Randall was long overdue. It will certainly not go unchallenged by tribal officials, the Indian bar, the noble savage mentality crowd and the others benefiting from the charade.

It is high time that those in these groups are not allowed to hide their criminal conduct, their lack of accountability, their denying us our civil rights, their incompetence and their other exploitations and greed behind this anachronism of the 17th century.

Perhaps, the only major point that Judge Randall missed in his dissent is the fact that over 75 percent of the Indian people in Minnesota today do not live on reservations and have in effect already rejected the concept of sovereignty as currently practiced in our tribal governments.

It wasn't too may moons ago that several of us in this column predicted that the greed generated by the so called return of the New Buffalo (gaming) would hasten the demise of tribal sovereignty and seriously erode what was left of our native culture.

Thanks, Judge Randall, for being the first to have the courage to stand up and be counted and give us back our dignity. For it is time that we shed the guardian/wardship relationship with the federal government and become as you say it, real Americans.

William J. Lawrence, *Thanks Judge Randall for giving us back our dignity,* Native American Press, Mar. 1, 1996, at 4.

Well-meaning individuals with the "noble savage mentality" fall prey to the charade that people residing on reservations are somehow primitive unspoiled children of nature, and when you visit them, like when you visit the Minnesota Zoo and view endangered species in an enclosed atmosphere, you are warned about bringing any contamination into that closed sphere so that nothing will disturb the precious ecological system. The "contamination" that so far has been prevented from "contaminating" Indian reservations is the Minnesota Constitution, the United States Constitution, the Bill of Rights, and all of the previously cited state and federal rights we take for granted.

The reference to "noble savage mentality" is not meant to be critical of any judicial brethren who think differently from myself. Rather, it is to point out the historically obvious, that when serious explosive issues of social justice and human rights are involved, courts differ. Justice Harlan, the lone dissenter in *Plessy v. Ferguson,* stated about his colleagues:

> *In my opinion, the judgment this day rendered will, in time, prove to be quite as pernicious as the decision made by this tribunal in the Dred Scott Case.*

163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Harlan, J., dissenting).

Analogies are proper forms of communication, often persuasive, and in Justice Harlan's case, compelling. I like Justice Harlan's position in 1896. I like mine today.

Justice Harlan suffered through 58 years of being thought wrong by most of his colleagues. In 1954, the United States Supreme Court gave Justice Harlan his life back through *Brown v. Board of Education,* which laid to rest the notion that a nation and its people could live in peace and harmony with the different races classified, then isolated, and then called "separate but equal."

This entire issue of "sovereignty" rests on **true red apartheid.** The American Indian will never be accepted in this state, in this country, until we recognize this "red apartheid" for what it really is, a pancake makeup cover-up of *Plessy.* 163 U.S. at 551, 16 S.Ct. at 1143 (holding that "equal but separate [railroad] accommodations for the white and colored races" was constitutional). No further cite, other than *Plessy,* is needed. I can only note, "Haven't we learned anything?" To get around *Brown v. Board of Education* and to accomplish the agenda of keeping American Indian people, at least while on reservations, dependant wards of the United

States Government, legal writers from time to time have attempted to classify American Indians, not as a racial class, but as a "political class."

*Morton v. Mancari* attempts to sidestep the bitter truth that Indian sovereignty is a race-based classification by stating that it is not race based, but is rather a "politically based difference." 417 U.S. 535, 553 n. 24, 94 S.Ct. 2474, 2484 n. 24, 41 L.Ed.2d 290 (1974) (stating that preferences for American Indians are not racial, but political, when the preferences apply to members of federally-recognized tribes).

The reader need only to walk through this classification and apply your own common sense and judgment to see its inherent fatal inconsistency. With four generally recognized races, red, yellow, black, and white, why is red, the American Indian, called a "political class?" If the federally-recognized American Indian is truly a political class, and not a racial class, it means, by definition, that all state and federal laws and all civil rights acts forbidding racial discrimination **no longer protect Indian people.** Since they are not a "race," they cannot come under the protection of laws forbidding racial discrimination. When this is thought through, and its implications made clear, I suggest those legal writers are going to say the equivalent of "Oops, we misspoke." What we meant to say is they are **both** a racial class for purposes of protecting them from racial discrimination, as all American citizens are, and a "political class" for purposes of job preference and life on a reservation. Now why are only Indian people both race based and politically based? The other three races comprising 99 percent of America are not.

Assume an Ojibwe, or Sioux, or Cherokee, an enrolled member of a federally-recognized tribe, has a job with the State of Minnesota in one of its many political divisions or agencies. Then assume that person, whether in a classified or unclassified position, is fired **solely** (job performance is not involved) because that person is an Indian. Assume that person brings a lawsuit citing federal and state antidiscrimination acts and the Minnesota Human Rights Act. Minn.Stat. § 363.01–.20 (1996). Assume the attorney

for the defendant agency sails into court and makes a motion for summary judgment on the grounds that under *Morton v. Mancari* and its progeny, federally-recognized Indian people have now been unidentified as a race and, therefore, the Minnesota Human Rights Act, and other like laws, does not protect them. I would hope that the defense attorney has negotiated for a straight hourly fee contract and not a retainer contingent upon success. *If you are not going to inject truth into this debate, get out of the debate.*

Ironically, the only place in the State of Minnesota where there is blatant and intentional civil rights violations and blatant and intentional discrimination with impunity is on Indian reservations and in their gaming casinos. The Minneapolis Star Tribune, as part of a lengthy front-page story, stated in pertinent part:

> They can't get hearings on the merits of their cases. The commission tells them it typically cannot enforce U.S. civil-rights laws in tribal casinos. And federal judges tell people they must take their cases to tribal court.
>
> State judges and the Human Rights Department deliver similar messages.
>
> Until last year department officials believed they had enough leverage to persuade tribes in some cases to settle complaints. But that leverage ended when the Minnesota Supreme Court ruled in November that Jill Gavle, a former Mystic Lake employee, couldn't sue the casino alleging sexual harassment.
>
> "That court decision makes it pretty clear that we don't have jurisdiction to force a casino to do anything," said Ken Nickolai, acting deputy director of the Human Rights Department.
>
> **"If they want to tell you to take a hike, they can,"** said John Gibson, *an enforcement officer* for the department.

Pat Doyle, *Today's Focus: Casinos and civil rights,* Star Tribune, Jan. 28, 1997, at 1 (emphasis added).

We have been warned before about the fatal inconsistencies between the American Indian Citizenship Act of 1924 and the post–1924 preservation of the reservation system

with its so-called "sovereignty." *See* Theodore W. Taylor, *Commentary on "Tentative Final Report" of the American Indian Policy Review Commission,* Apr. 18, 1977, and the *Separate Dissenting Views of Congressman Lloyd Meeds, D–Wash., Vice Chairman of the American Indian Policy Review Commission.*

I use the term "herd" not lightly, but after careful thought. Native people are forced to live on a reservation "if they want to enjoy all the wonderful benefits of sovereignty," which some seem to think is for their betterment. So the second they move off the reservation, they are not entitled to this "betterment." Minnesota off-reservation Indians are forced "to suffer the slings and arrows of the Minnesota Constitution, the federal constitution, and its Bill of Rights."

When you study the history of reservations, it becomes clear that the wiser and the more courageous the Indian leader, the more he fought being herded onto a reservation for himself and his people. Chief Joseph (Nez Perce), Quanah Parker (Comanche), Geronimo (Apache), and Sitting Bull and Crazy Horse (Lakota Sioux) were the last of the proud warrior chiefs to be forced onto reservations. If reservation life on federal enclaves was so great, would they not have clamored to get on, rather than fight and shed blood to stay off?

Today, an ugly reason for the bitter, divisive battle to preserve the status quo on reservations with economic development, principally Indian gaming casinos, is the growing flow of thousands and thousands of dollars by tribal government and its casino interests into the coffers of state and national candidates, and both national parties, Democrat and Republican.

Is this relevant in a judicial opinion? It is. It relates directly to sovereignty. I will quote from recognized independent newspapers. Newspapers, like scholarly journals, like treatises, like published books, like sociological studies in *Brown v. Board of Education,* have a legitimate place in legal opinions.

The Wall Street Journal broke the story on July 12, 1996 in *Midwest Indian Tribes*

*Flex Washington Muscle In Successful Drive to Sink Rival Gaming Project,* by staff reporters Jill Abramson and Glenn R. Simpson.

Then, on August 10, 1996, the Minneapolis Star and Tribune published *Tribes' political acumen growing,* by Greg Gordon, Star Tribune Washington Bureau Correspondent.

Both newspaper articles show the thousands of dollars which were funnelled directly to the two major political parties to promote the donors' agenda. *The donors were tribal councils and their casino interests.*

Let us pause. A federally-recognized tribal government comes under the purview and authority of laws surrounding political contributions. They may be state laws. They may be only federal laws, **but they cannot escape scrutiny.**

In Minnesota, corporations are specifically prohibited from contributing funds in support of or in opposition to a campaign for political office. Minn.Stat.Ann. § 211B.15, subd. 2 (West 1997). Foreign corporations violating this law face a fine of up to $40,000 and may be excluded from doing business in the State of Minnesota. *Id.* subd. 7.

Minnesota municipalities are regulated. The mayor and the city council are forbidden from taking municipal monies and writing checks directly to candidates for political office. There are legitimate means that all entities can employ, PACs, registered lobbyists, etc., but with any type of corporation, the scrutiny becomes intense and civil and criminal liability a possibility.

Federal law restricts corporate campaign contributions even more severely than Minnesota law, barring certain contributions by *any* corporation. 2 U.S.C. § 441b (1994) (prohibiting certain contributions by any corporation in connection with federal elections). Severe restrictions apply to federally incorporated Indian tribes and other federally incorporated entities. 25 U.S.C. § 477 (1994) (barring contributions in connection "with **any** election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office") (emphasis added).

Federally-recognized Indian tribes contributing directly to political candidates are in a "grey area" when 25 U.S.C. § 477, 2 U.S.C. § 441b(a), and other pertinent Minnesota state and federal laws are read together. Section 441b(a) states:

> It is unlawful for any national bank, **or any corporation organized by authority of any law of Congress,** to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever * * *.

2 U.S.C. § 441b(a) (emphasis added).

The two newspaper articles cited above are of public record. The matters contained therein revolve around issues of tribal government. I can only note that if appellant and other tribal governments persist in positioning themselves as "sovereign nations," then the "Indonesian" and the "Asian" problem of potentially illegal political contributions will be added to the scrutiny the above-cited laws call for.

If Indian tribal entities and their representatives undergo the same scrutiny as is expected of all other individuals and entities in this state and in this country on issues of political contribution and all is well, then all is well. *If all is not well, then all is not well.*

There is a complete lack of information on tribal council business as compared to what we normally get relative to city, state, and federal business. It must be noted that Minnesota's guarantees of freedom of the press, open meetings, and disclosure of public records are not enforced on Indian reservations. As a direct result, of the eleven reservations in this state with their approximate 12,000 members, not one single reservation has on its land an independent, privately-owned newspaper with an independent owner/publisher to bring the news about the reservation to readers both on and off the reservation. Many small towns in this state with populations roughly comparable to those of the eleven different reservations contain a locally-owned, truly independent newspaper or are serviced by major metropolitan dailies. On the other hand, no small town local independent newspaper or major metropolitan daily goes into reservation business council headquarters, as is common in all other government buildings in this state, and gets information because they want it, and because by law they can get it.

Minnesota's laws mandating freedom of public information to the press and to its citizens is forcefully protected everywhere in this state except on our Indian reservations. The failed federal policy of "sovereignty" prevents Indians on and off the reservation, and all other people on and off the reservation, from inquiring into tribal government.

Thus, much of what needs to be known, what needs to be exposed so that truth flows over the issue, is hidden from the light. The "darkness" on Indian reservations has been chronicled.

Noted Indian author Jim Northrup, Jr., a decorated Marine Corp. veteran from Vietnam, a state and nationally recognized writer on Indian country, said the following in the December 1996 issue of "The Circle." The Circle is subtitled "News from a Native American Perspective" ... (The Circle is a newspaper housed and published **in Minneapolis.** It could never survive if housed and published on a reservation.) In his regular column, *"Fond du Lac Follies,"* Jim Northrup stated in pertinent part:

> I went to the Reservation Business Committee's open meeting. This quarterly meeting was held in the Black Bear Casino. Remember when we used to have monthly open meetings?
>
> What a disappointment.
>
> Secretary/Treasurer Pete Defoe refused to give out information about how much money the RBC members make. So much for open government. He said no in spite of the fact that he signed an August request to make such information available. I would really like to see the RBC's income tax forms.
>
> Two lawyers spoke to the people about 1837 Treaty litigation and a 20 million dollar offer to settle a claims dispute. The droning lawyers almost put people to sleep. I wondered about those lawyers.

* * : * * * *

My friends from Scotland report the Association of Native American tribes is still doing a good job of educating the Scottish people about us. I bet it is hard for them to explain what the RBC is and how they work. I am longing for Scotland.

Jim Northrup, Jr., *Fond du Lac Follies,* The Circle, Dec. 1996, at 9.

Jim Northrup wears the "shield" of freedom of speech and wields the "lance" of the pen.

With no legislative oversight, no state judicial oversight, no freedom of speech and freedom of the press on Minnesota reservations, the reservation business councils with their gaming casino money go unchecked.

Another recent article by Jim Northrup stated in pertinent part:

On December 3, an application was received by the Fond du Lac Reservation Business Committee. The application for a gambling license is required under FDL Ordinance # 09/93, as amended.

The application was submitted by the Board of Directors of Fond du Lac Management, Inc. The letterhead lists the following Board members: Robert B. Peacock—Chairman, Peter J. Defoe—Secretary/Treasurer and members are Daryold Blacketter, George Dupuis and Clifton Rabideaux.

Hey—wait a minute! These are the same guys that sit as members of the Reservation Business Committee. Did they really ask themselves for a license? Want to guess what the vote was?

I wasn't there so I will have to surmise what happened at the meeting. Did the Chairman/Chairman ask for the license or was it one of the other voting members? Were they sitting on one side of the table as applicants and then on the other side of the table as voting members?

I think the Management Company should have regular citizens on the Board in addition to the RBC members.

It has been happening like this since the Ordinance was passed by the RBC in 1993. It ain't pretty but it is what passes for democracy on the Fond du Lac Reservation.

Jim Northrup, Jr., *Fond du Lac Follies,* The Circle, Jan. 1997, at 9.

It is sufficient to say that if Minneapolis or St. Paul gets a lucrative professional sports franchise under the partial or full ownership of that city, their city councils will not enjoy this kind of power.

Where is the "main stream press" in this state on this issue? I suggest they try to go to reservation business council meetings and demand their right to attend and their right to full and complete copies of all public documents under Minnesota open meeting law. Minn.Stat. § 471.705 (1996). I suggest the main stream press go to every "tribal court" in Minnesota and demand a complete and full list of all constitutions, statutes, internal rules, court rules, copies of past decisions, etc., the same as they can do today to any state or federal court in Minnesota.

There is another piece to the puzzle as to how we have arrived in the State of Minnesota, long known for its openness, in the corrosive and mismanaged atmosphere of tribal governments and their gaming casinos. That piece is the fierce opposition of those who oppose the Indian people crying for social justice and accountability; and the fierce opposition to those who support Indian people in their struggle.

An article from the October 25, 1996, Native American Press, entitled *Judge Randall Cut from Race Bias Task Force Meeting,* stated:

At a meeting on Thursday, October 17 some of the primary beneficiaries of tribal sovereignty used their influence to stifle the voice of a true advocate for Indian rights.

* * * Tribal culture and jurisdiction were primary topics of discussion.

The first judicial district's Race Bias Task Force and the American Indian Bar Association of Minnesota sponsored the meeting. Since it was created in 1994, the first district Race Bias Task Force has been very active in promoting educational programs on cultural diversity. * * *

Judge Spicer, chairman of the first district's Race Bias Task Force and a district

court judge in Dakota County, wanted a state judge to speak at the meeting on the Indian Child Welfare Act. When someone suggested Judge R.A. (Jim) Randall, Spicer rightly believed that Judge Randall sounded like the perfect candidate. As described in the August 9, 1996 issue of the Native American Press, Judge Randall, a judge on the Minnesota Court of Appeals, has a long history of standing up for Indian people. He has defended, promoted, and advocated on behalf of Indian people, Indian culture and Indian rights for over 35 years.

\*     \*     \*     \*     \*     \*

Based on this information, Judge Spicer naturally thought that Judge Randall would be an informative, interesting, and thought-provoking addition to any discussion about Indian culture, rights, and sovereignty. Judge Spicer didn't realize that his invitation to Judge Randall would be vetoed by the powerful and influential lobby that promotes tribal sovereignty.

\* \* \* The American Indian Bar Association threatened to withdraw their sponsorship of the meeting if Judge Randall spoke. Could it be that these powerful attorneys of Indian law are afraid of what Judge Randall has to say?

\*     \*     \*     \*     \*     \*

The Race Bias Task Force and the American Indian Bar Association could not find any other state or district court Judge willing or able to speak knowledgeably about the issues, so no one from a state court spoke at the meeting.

\* \* \* \*

Judge Spicer recently resigned his position as chairman of the first district's Race Bias Task Force. When asked why he resigned, Judge Spicer said, "What happened to Judge Randall was wrong. To me it was a freedom of speech issue. I felt morally bankrupt when it was all over and felt the only thing I could do was resign. I am still going to be on the Race Bias Task Force, but not as its chairman."

Julie Shortridge, *Judge Randall Cut from Race Bias Task Force Meeting,* Native American Press, Oct. 25, 1996, at 1.

What is remarkable about the above is that the Racial Bias Task Force is an official body promoted by the Minnesota legislature with the Minnesota Supreme Court monitoring policy and implementation throughout the courts in this state. The policy and implementation can be explained by a single statement. The Racial Bias Task Force is to promote openness about our multicultural state and expand our knowledge and our acceptance of our diverse population. As the Native American Press article sets out, this is hardly the case when the Racial Bias Task Force's implementation steps on the toes of tribal governments and their casino interests.

That people disagree from time to time with a judge after the release of an opinion (those involved in the opposition to my presence at the Race Bias Task Force meeting will concede what happened was a direct result of their disagreement with my dissent in *Cohen* ) is a nonissue. Throughout this state, throughout this country, in state and federal court systems, thousands of dissents and concurrences paper our law libraries. Dissents, concurrences, and majority opinions that some disagree with, come in a weekly stream from the Minnesota Intermediate Court of Appeals and the Minnesota Supreme Court. The same is true of all levels of appellate review in the federal system.

The response from those in Indian country concerned about true freedom and true openness on the issue of "sovereignty" was immediate. Within days, the Native American Press received the following letter from a respected Ojibwe author, essayist and writer of regular monthly columns for various Indian newspapers:

To the editor:

The recent report concerning the banning of Judge Jim Randall from a meeting of the Race Bias Task Force was certainly a disappointment, but not a great surprise.

Randall has proven himself a friend and advocate of the Native American community many times over while those who seek to stifle his voice have done little but promote themselves and protect their income.

Apparently those who felt threatened by Randall, (who may know more about tribal culture, history and law than they do) decided to protect their public image by keeping him out of the debate.

Many despots use this tactic to strangle the spirit of truth. If you don't like an opinion use your position of power and influence to ban it. That's the message that such small-minded conduct sends.

But it also raises questions about the American Indian Bar Association. Why DID the association threaten to withdraw their support of the meeting if Randall was allowed to speak?

At any rate the banning of Randall has succeeded in making us all poorer.

It's our loss when knowledgeable, thoughtful, radical words are deleted from the commons where ideas are formed and offered for discussion and debate by those who fearlessly and shamelessly protect our right to consider them and in the process find our horizons expanded and our lives enriched.

Yours in the struggle;

Anne M. Dunn

Cass Lake, MN

Anne M. Dunn, *Concerned with the Banning of Judge Randall from a RBTF Meeting,* Native American Press, Nov. 1, 1996, at 4.

State and federal trial and appellate judges speak regularly at public forums, symposiums, CLE courses, MILE courses, and at conferences and other meetings open to the public in public buildings. The Dakota County courthouse is a public building in this state wherein not just sitting judges, but more importantly, all citizens may come and listen, and if invited to speak, may speak their mind. Silencing a sitting judge, any elected official, any citizen, in a public building, calls into serious question the motives of those responsible.

In the previous reference to Albert Einstein's letter, just substitute "casino managers" for "industrialists." Then examine Einstein's further commentary:

[H]ow is it possible that this group, such a small minority, can make subservient to its desires the masses of the people who by a war stand only to lose and to suffer? The immediate answer is: the minority, the ruling class, is in possession of the schools, the church and **the press.** By these means it rules and guides the feelings of the majority of the people and bends them to compliance.

Albert Einstein, *Why War?* (emphasis added).

The "ruling class" can be paralleled to those in charge of tribal government and their casinos who wish to preserve the status quo.

The querencia is that part of the bullfighting arena where the bull chooses to make his stand in what he knows to be a life and death struggle with the matador. The querencia of public debate on social justice for Indian people has to be moved to the open air of a public forum and out of the windowless counting rooms of the reservation casinos. That debate is becoming a life and death struggle.

In 1997, and going back a few years, Minnesota's Indian reservations are starting to drown in a sea of litigation, state and federal, federal indictments, and federal investigations. There is a corrosive cancerous atmosphere within small cliques of people on reservations fighting each other. Tribal governments have to be allowed to organize under Minnesota laws pertaining to municipalities. Without that ability, reservation residents can never be guaranteed constitutional governments, fairly elected tribal officials, and a fair share of the gaming proceeds. They must be allowed to take title to their own land. The "federal ward relationship" from *Cherokee Nation* to today, as we approach the twenty-first century, is a vicious formidable obstacle that may not allow Indian people on reservations to make it to the twenty-first century. *Cherokee Nation,* 30 U.S. (5 Pet.) at 16 (characterizing the relationship between Indian tribes and the United States Government as one "resembl[ing] that of a ward to his guardian.").

Paul Tillich, the eminent German theologian and philosopher (1886–1965), wrote prolifically throughout his life using themes such as salvation, redemption, the struggle to rec-

ognize right from wrong, and the ongoing struggle for justice and truth.

In one of his essays entitled, "The God above God" from his book *The Courage To Be* (1952), Tillich discussed how "the courage to be" is sometimes found in the God (truth), who appears when surety about the existence of God (truth) disappears in the anxiety of doubt.

Tillich discussed, if I might paraphrase, that "grey mist of the soul" that appears at 3:00 in the morning when we lie awake in the anxiety of doubt, while the forces of darkness battle with the angel of truth in the "morgue of our conscience."

From examining their biographies and the history of their times, it is certain that President Lincoln on the question of slavery, and Justice John Harlan on the question of separate but equal, black apartheid, "knew 3:00 in the morning." History graciously has vindicated Lincoln and Harlan 100 percent, 500 percent, 1000 percent. At the time they spoke, contemporary history was not so kind.

In another essay, Tillich described those brief moments of clarity in our lives when for a second the "clouds part," and we are given a "fragmented moment of unambiguity." Tillich noted that they passed quickly, and were perhaps the only guidance that ultimately can be expected of divine providence. The agnostic cannot dial up heaven and get confirmation that it exists; the atheist cannot dial up heaven and get confirmation that it does not.

As the federal judiciary and Congress and elected state officials struggle to find their moment of clarity on the issue of social justice for Indian people, I suggest the moment of simple truth is:

A  Pre–1924, American Indian people had not been granted citizenship in the United States of America. The Indian Citizenship Act was passed in 1924. Act of June 2, 1924, 43 Stat. 253, now codified as 8 U.S.C. § 1401(b) (1996).

B  From 1924 on, all American Indian people are full citizens of this country and their rights as such cannot be abridged.

C  *Brown v. Board of Education* in 1954 included all citizens.

After 1863 (Emancipation Proclamation and Thirteenth, Fourteenth and Fifteenth Amendments), we no longer cited to *Dred Scott* and its progeny as controlling on the issue of slavery. After 1954 we no longer cited to the *Plessy* majority and its progeny as controlling on the issue of separate but equal. Controlling federal case law on Indian people predates 1924, much of it going back to the early and middle nineteenth century. *See, e.g., Cherokee Nation,* 30 U.S. (5 Pet.) 1. The preservation of the present federal government/ward status for Indian people hinges on a direct chain to *Cherokee,* and after 1924 the chain is broken. When you become an American citizen through birth, your legal life starts. When you become an American citizen through naturalization, your legal life starts over. In 1924 all American Indian people were finally granted full citizenship. You remain the same person, retain the same ethnicity, the same race, the same color, the same culture, and the same religion. But the legal dynamics of your life, your rights, your privilege, and your **obligations** start over, and are now confirmed by your status as an American citizen and as a resident of the state of your domicile.

There are dozens of pre–1924 cases, state and federal, discussing in various ways the themes we struggle with today, sovereignty, semi-sovereignty, qualified immunity, sovereign immunity, nation-within-a-nation, tribal government, tribal courts, self-determination, and self-governance. State and federal cases since 1924 discussing these issues use those pre–1924 cases in the chain of reasoning.

Yes, there is much to be learned from pre–1924 cases, but it is in an historical sense rather than in a relevance sense. *Dred Scott* and *Plessy* have historical relevance, but no longer have legal relevance.

We have in the past, and do now, preserve writings, documents, photos, and artifacts that date historical landmarks in our country's history, landmarks that mark changes in the course of this country's growth through social justice. We retain documentation and artifacts of slavery, such as old

photos, newspaper articles, old manacles and chains. But life has to go on! *Brown v. Board of Education* held unequivocally that segregation or apartheid based solely on the basis of race was a deprivation of the equal protection of the laws guaranteed by the Fourteenth Amendment to the federal Constitution. *Brown,* 347 U.S. at 495, 74 S.Ct. at 692. *Brown* was used as a touchstone, a lodestar, for the eradication of all other laws denying equal protection based solely on race. Rights too numerous to mention included, without limitation, voting rights, employment rights, housing rights, public accommodation rights, association and group activity rights, and a host of others.

*Brown v. Board of Education* did not exclude any race or color or ethnic group from its holding. It did not with specificity name Indian children, Hispanic children, Latin children, Chicano children, Korean children, Chinese Children, etc. But it included the all-encompassing "colored children." **No one was excluded.** *Id.* at 494, 74 S.Ct. at 691 (" 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children.' ") (quoting the findings of fact of the lower court).

Although Brown spoke specifically to the segregation of children in public schools under the guise of separate but equal, both its proponents and its opponents knew it was not limited to "children of school age," Both sides knew it included all persons regardless of age within its holding.

Today, the Minnesota Indian tribal reservation system is isolationism and red apartheid. It is the black apartheid practiced in this country before *Brown v. Board of Education.* It is simply wrapped in another color.

Indian people residing in Minnesota but not on a reservation are guaranteed the benefits of the Minnesota Constitution and the United States Constitution and its Bill of Rights

Indian people living on Minnesota reservations are not.

Indian people not living on reservations are guaranteed a voting process for their city, county, and state elections regulated by the Minnesota legislature, the Secretary of state.

Indian people living on Minnesota reservations are not.

Indian people in Minnesota not living on reservations are guaranteed the right and ability to buy and sell the home they live in.

Indian people living on Minnesota reservations are not.

Indian people in Minnesota not living on reservations are guaranteed that when tried for criminal offenses in a constitutional court and acquitted, they are freed.

Indian people living on Minnesota reservations are not.

Indian people in Minnesota not living on reservations are guaranteed the benefit of all federal and state civil rights laws.

Indian people living on Minnesota reservations are not.

Indian people in Minnesota not living on reservations are entitled to the benefit of OSHA laws; Americans with Disabilities Act laws.

Indian people living on Minnesota reservations are not.

Indian people in Minnesota not living on reservations are guaranteed the right to civil service classification laws; teacher tenure laws; National Labor Relationship Act laws pertaining to the right to unionize.

Indian people living on Minnesota reservations are not.

Indian people in Minnesota not living on reservations are guaranteed freedom from discrimination based on gender, age, religion, race; and all other state and federal laws that protect the broad state and federal constitutional guarantees of citizens in this country.

Indian people living on Minnesota reservations are not.

Indian people living in Minnesota not on a reservation have a constitutional guarantee of direct access to state and federal courts in Minnesota.

Indian people living on Minnesota reservations do not.

Indian people living in Minnesota not on a reservation are treated the same as all other Americans. *Brown v. Board of Education* protects them.

Indian people living on Minnesota reservations do not have that protection.

*See Tom v. Sutton,* 533 F.2d 1101, 1102–03 (holding federal constitution inapplicable to Indians on reservations).

If the pernicious dichotomy I have outlined leads to the observation that Indian people (American citizens) living on Minnesota's reservations are not treated "separate but equal" (which would be unconstitutional), but are rather treated "separate but less equal," then the compelling mandate of *Brown v. Board of Education becomes even more compelling* that immediate unflinching attention be paid to this issue of social justice and the necessary corrective measures taken.

*Sutton* remarkably states that the *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), constitutional guarantee to appointed counsel does not apply to "Indian courts" in criminal trials and is not a constitutional right guaranteed to Indians living on the reservation. The *Sutton* court went on to state in part:

This holding is consistent with other judicial decisions finding the Constitution inapplicable to Indian tribes, Indian courts and Indians on the reservation.

533 F.2d at 1102–03.

*Sutton* is a lesson in the history of the denial to those domiciled on an Indian reservation of the most basic rights we enjoy as American citizens.

A respected United States Senator, a recognized expert on constitutional law, former North Carolina Senator Sam Ervin, introduced a bill in 1965 to ensure that American citizens living on Indian reservations were protected from their tribal leaders, just like the United States Constitution protects all citizens from the arbitrary power of the United States government. It can be assumed that Senator Ervin, with his tremendous legal background, understood the serious *implications of parallel governments in* this country for Americans where in one track the U.S. Constitution (and thus the

state constitutions) were in place, and another parallel track where they were not. *Tribal leaders aided by the Department of the Interior and the Bureau of Indian Affairs appeared in opposition to Senator Ervin's proposition that Indian tribes adopt the United States Constitution "in toto" and they were successful in defeating Senator Ervin.*

The clear import of the statute is that a criminal defendant may be represented by counsel but only at his own expense.

This interpretation is further supported by the legislative history of the Indian Civil Rights Act. In 1965, Senator Ervin introduced a bill which would have restricted the Indian tribes, in exercising their powers of local self-government, to the same extent as imposed on the United States government by the United States Constitution. However, when hearings on this bill before the subcommittee of the Senate Judiciary Committee **were convened, representatives of various Indian tribes appeared in opposition to the adoption of the federal constitution** *in toto.* As a result of the objections to Senator Ervin's bill, the Department of the Interior submitted a substitute bill which **guaranteed only specific enumerated rights to the Indians.**

*Sutton,* 533 F.2d at 1104 (emphasis added).

The final bill had several notable exceptions to the requirement that federal and state governments observe the Constitution of the United States.

The subcommittee endorsed the substitute bill and, in its summary of the report, stated:

'The Department of Interior's bill would, in effect impose upon the Indian governments the same restrictions applicable presently to the Federal and State governments with several notable exceptions, viz., the 15th amendment, certain of the procedural requirements of the 5th, 6th, and 7th amendments, and in some respects, the equal protection requirement of the 14th amendment.' The summary of the report was subsequently

adopted and endorsed by the Senate Judiciary Committee.

*Id.* at 1104.

The American Indian Citizenship Act, Section 1401(b) states:

**§ 1401. Nationals and citizens of United States at birth.**

The following shall be nationals and citizens of the United States at birth:

\*   \*   \*   \*   \*   \*

(b) a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: *Provided,* That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such persons to tribal or other property;

8 U.S.C. § 1401(b).

Some may argue that the surviving of "tribal and property rights" enables this unconstitutional due process to continue. In terms of property rights, section 1401(b) is nothing but a reiteration of longstanding law that applies to all landowners.. At one time in America, there were no organized states. Then there were 13, and then one by one we moved to 50. People owning land in a territory which later became a state retained their rights of ownership in that land. Today, when unincorporated townships become cities or towns, or are merged into cities or towns, the property landowners come under new laws and regulations and the legal dynamics of governance changed, but their land title does not. This country has always recognized this principle. If Indian tribes owned land prior to 1924 or have residual gathering rights from treaties signed before 1871, American citizenship would not diminish those property rights. But "tribal tradition," if it results in the denigration of human rights and civil rights, had to change when full American citizenship was granted in 1924. If not, you have, as I point out, classic red apartheid, apartheid between Indian people living on reservations who are denied constitutional guarantees and Indian people living off the reservation who enjoy all state and federal constitutional guarantees.

Clear example: in 1924 no state, no law enforcement personnel, no state or federal judges granted their citizens the constitutional rights of *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Gideon,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Wong Sun v. United States* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), etc. But when those cases went into effect, no state or federal court that had previously not granted them (because they had not been articulated) was exempt from protecting those guarantees in the future. No state had "grandfather rights" in what had formerly been considered due process, but is now considered a constitutional abuse of due process.

Yet today, "*Sutton* reasoning" purports to allow Indian tribes and Indian tribal courts to "cherry-pick" the constitutional guarantees and the due process that they want to extend to the residents of the reservation. At the same time, those very same residents, the minute they are one foot off the reservation, have a right to demand, and we will give them, every single enumerated constitutional right existing in 1924 right on through all expanded constitutional rights to this month in 1997.

The fair, the hard but true conclusion is that this duality of on-reservation life and off-reservation life is red apartheid. I respectfully argue that *Brown v. Board of Education* and its progeny excluded no one from the power of its protection.

The ill treatment, and the denial of the most basic rights continue on reservations if the tribal council so votes. This is not to state that there are civil rights and denials of due process of constitutional dimension on all of the over 500 federally-recognized tribes in this country. This is not to state that there is systemic and institutionalized mismanagement on all of the over 200 Indian gaming franchises in this country. But this concurrence is to state that there are documented abuses and documented mismanagement, and there can never be constitutional *guarantees* of due process on *any* of the 554 federally-recognized tribes until we recognize, and then admit, that red apartheid exists, and

take the necessary corrective measures to bring every citizen in this country under the federal constitution and their state constitution "*in toto.*"

An article about the Laguna Pueblo in the December 20, 1996 issue of the Native American Press stated in pertinent part:

JUDGE REFUSES TO ALLOW WOMAN ON TRIBAL BALLOT.

A Laguna Pueblo judge has ruled that a woman cannot run for the office of tribal treasurer in Monday's election, but voters will decide whether women should be allowed to break into Laguna politics. Tribal Judge Melvin Stoof on Thursday upheld a Laguna Tribal Council decision that Emily Cheromiah, 44, could not seek the post of treasurer on the grounds that tribal traditions prohibit women from running for office. While voters won't be voting on Ms. Cheromiah specifically, they will be asked to decide whether women in general should be allowed to run in future elections for tribal offices of treasurer, secretary, interpreter and as council delegates from the six Laguna villages.

*Judge Refuses to Allow Woman on Tribal Ballot,* Native American Press, Dec. 10, 1996, at 2.

It can be noted that on the Laguna Pueblo, a 1992 ballot question asked "voters for their input on the role of women in tribal politics." The proposition allowing women on the tribal ballot was passed by a vote of 730 to 425. But following the vote, tribal councilors said "the 1992 vote was not binding."

Since 1924, all women and minorities, including all Indian people living in any part of their state except on a reservation, have enjoyed tremendous advancements in the area of social justice and the right to the full protection of their state constitution and the U.S. Constitution. Why have we left those Indian men and women who choose to reside on their home reservation locked in the Eighteenth and Nineteenth Century? The legal dynamics of 1924 when American citizenship was conferred on America's Indian people *has to stand for something.*

I can only note that until state and constitutional guarantees are firmly in place, any Indian tribal government, on a given day, can decide to extend some rights to reservation members and then the next month or the next year change their mind and take it away or limit it.

The civil rights abuses and the denials of due process reflected in this opinion affect men and women alike, affect Indians and non-Indians alike. The criminal defendant in *Sutton,* and the criminal defendant in *Red Lake v. R. Smith* were Indian men. The Laguna Pueblo "tradition" involved Indian women. The plaintiffs in *Gavle* and *Cohen* were non-Indian women. The respondent in this case is a non-Indian business entity. Put another way, anyone who enters onto an Indian reservation or touches it in a commercial way is subject to a possible lack of state and federal constitutional guarantees. This condition, this "black hole" in the federal constitution, exists nowhere else in the United States of America. For those members of well-managed reservation business councils, for those reservation business councils that operate well-managed Indian gaming casinos, they need to come forward and help take an open and honest lead for the needed reforms so that all do not eventually get dragged down.

Recently, tribal members from across the country assembled in Washington, D.C. "to protest threats to their sovereignty." The protest was not about Native culture. The protest was against legislation passed by the State of Rhode Island that affected Indian gaming in Rhode Island. The state legislation was "aimed at leveling the playing field on all parties seeking to open a casino."

One Minnesota tribal leader was quoted as stating, "We're going to put the 105th Congress on notice that Indian tribes will not tolerate attacks on their sovereignty." Brian Bakst, *American Indians demonstrate at Capitol to protest 'attacks on sovereignty',* Native American Press, Jan. 24, 1997, at 1, 3.

I can only note the obvious. Between *Cherokee Nation, Oklahoma Tax Commission v. Texas, Rice v. Rehner, Gavle, United States v. Wheeler, Lone Wolf, and Race Horse,* and all of their respective progeny, it is beyond dispute that the Congress of the United States of America has Indian tribes

under its plenary power and has total control over tribes to the point where their immunity can be limited or completely eliminated. Thus, the January 1997 demonstration at our Nation's Capital, put another way, was as ineffective, futile, and arrogant, as any group of American citizens traveling to Congress "to demand" that Congress stop passing laws affecting taxation, clean air, clean water, civil rights acts, the budgets of federal agencies, and the budget for the Pentagon!

The protesters' argument cannot be taken seriously if constitutional guarantees for Indian people living on reservations, and all those who come in contact with reservations, are finally going to be put in place.

The "protest" was not about culture or anyone's way of life. It was a protest against an attempt by the State of Rhode Island to regulate gaming casinos within its borders. Rhode Island, like all states that sanction any type of gambling, has in place state regulations emphasizing accountability.

The issue today that is covered in this opinion is not, and has never been, about freedom of culture and freedom of religion. The United States of America and its 50 states are among the finest places in the world to enjoy constitutional guarantees of freedom of culture and freedom of religion. Christians of all sects, practitioners of Judaism of all sects, Muslims, Buddhists, etc., anyone who uses churches, temples, synagogues, mosques, etc. have rigid protection laws in place, and a history of rigid enforcement. Smaller groups that might be considered out of the main stream enjoy the identical protection in this country. Some examples might include, without limitation, Amish, Mennonites, Hutterites, Hasidic Jews, strict fundamentalist sects, Evangelical or Charismatic sects, etc.

Religion and culture are used, cruelly, by tribal business interests to act as "the point" or shield for the tribal business interest's all-consuming desire to remain free of the normal rules of accountability that surround the federal government and its agencies, that surround state government and its agencies, and that surround municipalities within a state's border.

A year ago, Washington, D.C. played host to a conference called "The National Summit on Ethics and Meaning." A contributing editor to Harper's Magazine who attended the conference had the following observation about the different uses the trendy buzz word "religion" is today attached to:

I whispered to myself Charles's phrase *last days, last days* and pursed my lips and gritted my teeth and tried to keep my mind sharp and my heart open as I heard with astonishment—among educated and privileged people—some of the worst nonsense I have come across in more than forty years of listening to people in public places butcher truth and sell themselves to others.

Peter Marin, Essay, *An American Yearning,* Harper's Magazine, at 37 (Dec.1996).

That observation comes to mind as I examine the issues in this case and others, issues of "sovereignty" wherein, in truth, the issues are only about dollars.

Why is social justice in this country today always about the—money?! Indian "sovereignty" today is used principally for three reasons: (1) for the tribal government and its casino interests to shield tribal enrollees on and off the reservation from how much money is being taken in; (2) as a shield for alleged law breakers to attempt to avoid prosecution under applicable state and federal criminal laws (*see Jackson,* 558 N.W.2d 752 (Minn.App.1997); *Stone,* 557 N.W.2d 588 (Minn.App.1996); *Bray,* 555 N.W.2d 757; and the above-referenced sovereign defense of the tribal officials in federal district court in 1996); and (3) as a shield to keep from having to answer as defendants in bona fide civil lawsuits (*see Gavle,* 555 N.W.2d 284, and this case).

The black african slave trade was also about the money! White slavery was about the money! The importation of Chinese people (we called them "coolies" then) in the nineteenth century to complete our railroads from the east to the west was about the money! Mexican Braceros stoop-picking lettuce and sugar beets, and denied the benefits of unionization was about the money!

There is a ray of hope. *Sutton* has never been reviewed by the U.S. Supreme Court. It has never been cited as a constitutional exception to *Brown v. Board of Education.* What *Sutton* purports to say is that individual Indian tribes have the right to pick and choose what constitutional guarantees, what amendments to the Bill of Rights they and their "tribal courts" will grant to American Indians domiciled on the reservation. *This must give us serious pause.*

If the voices of Indian and non-Indian people who know that wholesale institutionalized change must come, and come quickly, before the cancer of red apartheid becomes incurable, are not heard (meaning the present isolationism and apartheid of reservation life is continued) we might as well do Minnesota reservations the courtesy of appropriating money from Minnesota taxpayers and the federal treasury to ensure that their water fountains are equal to ours, that their lunch counters are equal to ours, that the tribal courts have as many computers and books as we do, and that their schools are equal to ours!

We put up with slavery from 1619 to 1863. We put up with black apartheid from 1863 to 1954. It is now 73 years since the American Indian Citizenship Act of 1924. The state courts, federal courts, state legislatures, the federal Congress, state executives and federal executives have had enough history to "make things right."

Using *Brown v. Board of Education,* laws passed by Congress, and executive proclamations (see Emancipation Proclamation) as a vehicle, we immediately need to put into motion case law and statutes conferring on all American Indians full statehood and full right to the United States Constitution and its Bill of Rights regardless of where they live in America. If there is confusion or uncertainty on how best to accomplish this overriding need, *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), wisely denominated the tie breaker.

We need to establish Indian reservation boundaries and begin "the municipal process" of bringing them under county, township, and city forms of government. The mechanics can be worked out. Minnesota's Municipal Commission, Minn.Stat. §§ 414.01–.09 (1996), and similar state agencies in other states, have been in business for years. We have the ability. We platted and land-titled this entire country from Plymouth Rock west to the Pacific Ocean.

We need to move as quickly as possible to abolish all tribal courts and as expeditiously and efficiently as possible move all pending matters into the nearest state or federal district court with venue and jurisdiction.

The issue before us, tribal courts and their "comity" and "jurisdiction," is simple. After consultation between federal, state, and tribal leaders as to how to allow an orderly transfer of all pending matters to the nearest state court, meaning the nearest independent court, tribal courts *should be abolished overnight.* Nothing would be lost for people on reservations because as state citizens they should have the right now to direct access to Minnesota district courts to plead their cases and to plead their defenses. *See* Minn. Const. art. I, § 4 (stating "[t]he right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy"). Other state constitutions similarly protect their state residents. *See, e.g., Lambert v. Ryozik,* 268 Mont. 219, 886 P.2d 378 (1994). In *Lambert,* an enrolled member of an Indian tribe brought a personal injury action in Montana state district court against a non-resident motorist for injuries arising out of a car accident that occurred within the boundaries of appellant's tribal reservation. The defendant motorist moved to dismiss the action "for lack of subject matter jurisdiction." The district court dismissed the lawsuit, believing it was guided by precedent that stated the jurisdiction of the tribal court pre-empted the jurisdiction of the state district court.

The Montana Supreme Court made short shrift of the argument and stated flatly that plaintiffs (Montana Indians), as full Montana citizens, had an absolute right under the Montana Constitution to sue non-Indians in Montana state court. The court said that the failure to recognize this right to sue would deprive an Indian plaintiff of due process and

equal protection of the law under the Montana Constitution. *Id.* 886 P.2d at 380.

To accommodate litigants, Hennepin County and Ramsey County court trial judges, for instance, have for years maintained moving locations within the Twin Cities suburbs to service their constituents. Arrangements can be made to hold state district court hearings on Indian reservations. We are only talking about bringing an additional 12,-000 people into our state constitutional provisions who are now denied them. They, like the rest of us, are entitled to direct access to our constitutional state courts. If the tribal courts do not dissolve immediately, why cannot Indians living on a reservation have the unambiguous undeniable right to opt out of that court system and transfer their cause of action, whether civil or criminal, to the nearest state district court with venue? *Brown v. Board of Education* would seem to mandate that you cannot impose inferior tribunals on one set of citizens.

Other problem areas will arise, needs will come to the surface, but it can be done. This country survived slavery, black apartheid, World War I, the Great Depression, and World War II. When it is essential to make things right, America has always passed the test.

The solutions of constitutional dimensions are straight forward. Give Indians living on reservations full statehood; give them state-regulated municipal forms of government; allow them to own their land in fee simple; do immediate audits of all Indian gaming casinos through a cooperative effort of state and federal agencies. We do that now with all banks in this country. Bank examiners make regular audits at irregular times to ensure that the money that is supposed to be there, is there. Periodic bank examination works to the benefit of the bank. It ensures confidence in them by the public. The periodic examinations work to the benefit of the public, it maintains that confidence. The General Accounting Office (GAO), an official branch of the federal government, has the right to monitor federal enclaves, federal agencies, and anything else Congress directs it to, over which Congress has plenary power.

Whenever states or the federal government grant lucrative commercial franchises, which at times can amount to a partial or full monopoly of certain kinds of commerce, carefully crafted state and federal regulations work together to ensure that the public trust will not be abused and that public money will be accounted for.

The Securities and Exchange Commission (SEC), the Federal Communications Commission (FCC), and the Federal Trade Commission (FTC) are but a few examples of the numerous federal agencies, which, with their parallel state counterparts, protect the public interest in such areas as securities, registration and their buying and selling, the awarding of airwave rights for radio and television stations, and the selling of insurance and real estate.

The awarding by states of the right to operate a gaming casino, lotteries, pull tabs, horse racing, parimutuel betting, etc. are all tightly controlled by state and federal regulations for the same sound reasons.

Several years ago, the federal government took the fairly unusual, but perfectly legal, step of taking over control of the Central States' Pension Funds of the Teamsters' Union. It was highly charged politically, but it had to be done to protect the assets and the pensions of the members. Duly appointed officials assisted and supervised the Funds' Trustees to ensure an open and orderly accounting of funds received and funds disbursed.

We have never had the decency and the concern for Indian people to ensure that when we granted monopolistic gaming franchises to Indian tribes, those franchises were accompanied by the necessary state and federal regulations needed to guarantee that funds received and funds distributed were accounted for and the intended beneficiaries fully protected.

The ownership of Indian gaming casinos by the tribes is not the issue. State and federal regulation and open and full accounting is. All Americans, whether Caucasian or of color, anywhere off a reservation engaged in any of the above-named commercial enterprises are equally subject to the appropriate

state and federal regulations and authorities regardless of race, culture, or creed.

A federal district court in Minnesota in 1996 went through two lengthy trials, previously described in this opinion, trials which involved multiple defendants and multiple counts, trials where the investigations started back six to eight years ago. To prevent similar trials from happening again, would it not be appropriate to check with the federal prosecutor's office, his staff and his investigators, to see whether they had any suggestions for the type and frequency of complete audits (as all state and federally chartered banks, regardless of minority ownership or not, are subject to) and other concrete and sensible suggestions to ensure that casino revenues are properly accounted for to all tribal enrollees and the public? Just go ask them.

Direct federal and state law prosecutors to consider full or partial amnesty in as many cases as possible. Thorough audits will uncover mismanaged funds. That is a given. But it is more important that the money be returned to its rightful owners, Indian people, and that the casinos get off to a good start than it is that we spend precious time pointing fingers and going through criminal trials, except possibly those that cannot be avoided.

The state/federal issue of "gathering rights" in ceded territory remains open in the Minnesota–Wisconsin area and in other scattered areas in this country. Not all of our 50 states have federally-recognized tribal reservations within their borders and not all those reservations have ceded territory/gathering rights issues. But Minnesota and neighboring states do and the issue is important, volatile, and bitterly divisive. Thus, it needs to be addressed, as ceded territory/gathering rights revolve around "sovereignty." Gathering rights in ceded territory have, and are entitled to have, a life of their own even after the present day version of "sovereignty" is mercifully exposed, eradicated, and replaced with full statehood and full citizenship rights.

The reason gathering rights have a life of their own is that they predate 1871, the year that the U.S. Congress emphatically announced that no more treaties would be signed with Indian tribes because Indian tribes were not independent foreign sovereign nations. But Congress rightfully acknowledged the validity of treaties signed before that year. Thus, present ceded territory/gathering rights cases in federal court must play out until the existence of residual gathering rights from the nineteenth century, if any, is known.

Federal trials to date have found that some residual gathering rights exist; and have found in other cases that gathering rights were fully bargained away (through treaty or other agreement or congressional act). For the residual treaty gathering rights that are found to exist (after the appellate process grinds to a close), fair compensation is due those individuals and tribes whose gathering rights have been found to exist. Any gathering rights found to exist will impact a substantial portion of Minnesota and Wisconsin outside of present reservation boundaries. Business people and homeowners alike in the affected ceded territories are legitimately worried about the possible eventual outcome on their land titles and on their property values and the issue of who will have what ingress and egress to their land which they formerly. thought to be theirs unconditionally. Indian people with gathering rights have legitimate concerns about getting what is rightfully theirs. At this point, state and federal government, with the undisputed power of eminent domain, needs to step in quickly and begin the process of condemnation of whatever residual gathering rights in ceded territories are found to still exist. The power of eminent domain belongs to state and federal governments. There is a simple two-prong test. It must be for public use and just compensation must be paid. Just compensation can be determined by pretrial agreement or either side can demand a right to a jury trial and the appellate process on what is fair compensation. The power of eminent domain is most used with the condemning of land, but it is also used for other types of property.

Personal property is subject to the exercise of the power of eminent domain. Intangible property [is] within the scope of

this sovereign authority as fully as land or other tangible property.

*Waste Recovery Co–op. v. County of Hennepin*, 504 N.W.2d 220, 227, (Minn.App.1993) (quoting 1 Julius L. Sachman & Patrick J. Rohan, *Nichols' The Law of Eminent Domain* § 2.1[2] (3d ed. 1993)).

The same is true with the federal power of eminent domain.

And it is clearly established that the power of eminent domain extends both to intangibles, *see Cincinnati v. Louisville & Nashville R.R. Co.*, 223 U.S. 390, 400, 32 S.Ct. 267, 268–69, 56 L.Ed. 481 (1912), and to the product of intellectual activity, *see Interdent Corp. v. United States*, 488 F.2d 1011, 203 Ct.Cl. 296 (1973) (per curiam).

*Nixon v. Administrator of Gen'l Svcs.*, 408 F.Supp. 321, 357 n. 49 (D.D.C.1976).

The residual gathering rights in ceded territory need to be fairly assessed and then taken through the power of eminent domain. There is nothing illegal or racial in this process. During the 1960s when the federal interstate system spread throughout this country, at times like quack grass, individual homes, businesses, and at times whole neighborhoods like the minority Rondo neighborhood in St. Paul, Minnesota, were swallowed up. Mechanical issues of should the highway go here or should it be moved over there are always with us. But no one owning a home or a business could ever dispute that the power of eminent domain has survived all constitutional attacks once the first prong of public use is met; only the issue of what is fair compensation remains.

In Minnesota, approximately 60,000 American Indians, and perhaps some in other states who have enrollee rights in Minnesota, are affected. I suggest the amount of money that will finally be assessed as fair compensation will be large. It will take a little bit of work, and perhaps some difficult work, to distribute those funds to the proper people, both on and off-reservation enrollees, in proper shares. The proportion or percentage of those shares is purely mechanical, that can be worked out later. With only 60,000 Indian people in Minnesota and only several thousand more around the country (I suggest that less than half of Indian people in this country will even be affected, as most do not have this issue), the distribution in a fair manner can be accomplished. Each year the Internal Revenue Service, to name one federal agency, collects from American people and businesses approximately 1.3 trillion dollars. Every year Congress, another branch of government, redistributes it.

I am fully aware that the gathering of fish, animals, berries, medicinal plants, and herbs is a traditional part of American Indian culture. I am also fully aware that the spearing of walleyes during the spring spawning season is legitimately cultural. Spring is the "gathering season" for those fish. But the giving up of the right to gather in ceded territory land is no price to pay at all for the cessation of the bitterness and the corrosive atmosphere that this issue has visited on this entire state and neighboring states for most of the last decade and with no end in sight. With the compensation to be divided among a relatively small group of people, it will be a legitimate financial windfall.

Both on and off-reservation enrollees who are affected will retain the following: They will retain **all** the same hunting, fishing, wild rice harvesting, and berry picking rights, etc. that all state citizens enjoy now. In addition, they will have the financial ability with which to pursue such things as the ownership of game farms, buffalo herds, (the Lakota Sioux and other tribes in South and North Dakota have been doing this for the last few years), deer farms, the purchase of private lands for hunting and fishing, as many people, Indian and non-Indian, do now, and other avenues, to make up for just the partial loss of present hunting and fishing rights. I use the term partial because it will only be the loss of hunting and fishing (gathering rights) privileges in certain parts of certain states where, quite truthfully, only a relatively small number of Indian people today even exercise those rights. In return, they are guaranteed by law fair compensation. That is all any citizen is guaranteed. The power of eminent domain can be used ethically and legally for a public use and to promote the public good.

Most certainly there will be these and other important legal issues of social justice

for Indian people that will need addressing in the future. If I have to write further, I retain a pen. But the next time I would rather put the pen down and ask those who have questions to retrace with me the parts of the last five decades that I have spent in Indian country and with Indian people. I will show you beauty.

I will show you the beauty of school teachers, without tenure and job security, struggling to teach their young students the value of self-esteem and education on reservations where the schoolhouse roof leaks and the casino roof does not.

I will show you the beauty of the Indian way of life, of sharing, of concern for the young and the elderly, of respect for culture and tradition when culture and tradition are not embroiled in the power struggle for control of tribal government and the reservation casino.

I will show you the beauty of a young Indian woman, a composer, singer, and songwriter, a young woman engaged in the struggle for freedom, singing softly but fiercely of "the storm that's vowed to rage."

The hard issue of "Sovereign Nation" versus the realities of Indian tribes as semi-sovereign governmental entities under the plenary powers of Congress has to be addressed immediately and decisively. Then, the proper reforms to bring all the Americans living on Indian reservations under the protection of their respective state constitution and the United States Constitution must be addressed with the same unflinching resolve that the U.S. Supreme Court, without the benefit of precedent, and flying in the face of precedent, firmly established in *Brown*. *Brown* was the watershed in our multi-cultural country's agonizing search, at times bloody, for social justice without apartheid.

A weak defense of the *Dred Scott* court would be that laws against slavery were not put into the final draft of the Constitution, and that, "after all, slavery represents the norms and values of part of this country." Recently retired Federal Circuit Court Judge Leon Higginbotham, Jr. concluded:

[D]espite the legalese in the Dred Scott opinion, it was "nothing more than a Southern manifesto on the institution of slavery."

Yale Kamisar, *Jim Crow on the Bench*, New York Times Book Review, Nov. 24, 1996, at 10.

But if it cannot be said that the *Dred Scott* court went "belly up," it can be argued that the *Plessy* majority went belly up. Judge Higginbotham came to the conclusion that Plessy may have been a more catastrophic racial decision than *Dred Scott*. He felt so because *Plessy* was decided twenty-five years after the Thirteenth, Fourteenth, and Fifteenth Amendments were adopted.

Judge Higginbotham points out that

in the course of upholding segregation laws, the Plessy Court relied on a number of cases that were decided before the adoption of the Civil War amendments. He calls the case "the final and most devastating judicial step in the legitimization of racism under state law."

*Id.* at 10.

The length of this opinion, with majority and concurrence is far less than the length of *Dred Scott*. I know that the majority, concurrences, and dissents in *Dred Scott* were studied carefully, as the issue was important. The issue here *is also important*.

In 1954 with *Brown*, "America's ship on course for social justice" righted itself in words so clear that, despite strong opposition from the Southern block in Congress, President Eisenhower, himself personally not sure that Brown should have been written, set his jaw and declared that if this is the law, *federal troops, if necessary, will enforce the law*.

American Indian people had been granted citizenship for 30 years before the passage of *Brown*. Yet today, they have to leave their homes on the reservation to get the benefits of *Brown* and its progeny. The day they set foot back on their reservation, they are cast backwards into the time warp of apartheid.

That time warp has been accompanied by the lucrative monopoly in several states of Las Vegas style gaming casinos. That American Indian people have something com-

ing for the total colonization of their country by Indo–Europeans is not in dispute. But 554 tiny federal enclaves where state and federal constitutional guarantees are not in place, and the proceeds from the gaming casinos are not subject to state laws requiring municipalities to account for every penny of their municipality's dollars has come to mean a cruel hoax. Until there is the same accountability that all municipally-owned business entities are subject to, Indian gaming will continue to be a cancerous sore on those Indian people who have not yet left their reservation.

The denial of state and federal constitutional guarantees effects all Indians and non-Indians that live on or visit or touch a reservation. The defendant Ronald Smith from Red Lake, Minnesota and the defendant Rolf Tom from the Lummi Reservation in the State of Washington were Native Americans denied clear cut state and federal constitutional guarantees. Sylvia Cohen and Jill Gavle were non-Indian women who were denied the constitutional guarantees of state or federal district court jury trials for injuries alleged to have happened on a reservation. Put another way, the cloud of denial of due process on reservations operating under "sovereignty" touches everyone.

It is significant that the knowledge that "all people need to be treated alike," memorialized in *Brown v. Board of Education, was foreshadowed in 1877* by a great American Indian chief and leader. With our present scant but growing knowledge of American Indian history and culture, there are a few names which may be recognized by many readers, some school children. Chief Sitting Bull, Crazy Horse, Seneca, Chief Seattle, Geronimo, and Red Cloud are but a few. I apologize for not mentioning all others who deserve mentioning.

The one I am referring to is Chief Joseph (Young Joseph) of the Nez Perce Tribe (1840–1904). Students of American Indian history are familiar with Chief Joseph's epic struggle with the United States Cavalry in 1877 to bring his people over 1,000 miles from Oregon through Montana toward Canada where he knew freedom lay. It is ironic that he knew freedom lay in a country that was not his, Canada, and did not lay in the country that was his, America. For over 1,000 miles of rough terrain and inclement weather, his small band of warriors fought off, in one of the most famous rear guard actions in American military history, the might of the U.S. Cavalry. The military tactics and the bravery of Chief Joseph and his warriors have been compared to the First Marine Division in late winter of 1950, coming out of the Chosin Reservoir in Korea while holding off several enemy divisions. The Nez Perce warriors struggled to protect the elderly, their young, and their women with the hope of reaching Canada safely. On September 30, 1877, with most of his warriors dead or wounded and his people starving and just in view of the Canadian border and freedom, Chief Joseph surrendered to federal troops saying:

It is cold and we have no blankets. The little children are freezing to death. My people, some of them, have run away to the hills, and have no blankets, no food, and no one knows where they are—perhaps freezing to death. I want to have time to look for my children and see how many of them I can find. Maybe I shall find them among the dead. Hear me, my chiefs, I am tired. My heart is sick and sad. From where the sun now stands, I will fight no more forever.

Jim Robbins, *Into the Storm*, Conde Nast Traveler, Sept. 1996, at 166 (quoting Chief Joseph from Oct. 5, 1877).

The article detailing the above went on to state:

The fighting had ended, but the dying was not yet over. Despite a promise by General Nelson Miles that they could return to their homeland if they surrendered, the Nez Perce were forced into exile in Oklahoma, where more people died of disease than had died during the four months of war. Despite pleadings to be able to return to their homeland, some were sent to Washington State to live on a reservation there, some went to Idaho, and a few remained in Canada. Charles E. Wood, an aide to General Howard, summed up much when he wrote, *"I think that, in his long career, Joseph cannot*

*accuse the government of the United States of one single act of justice."*

*Id.* (emphasis added).

If there is an American Indian leader one might think would strive for isolationism, for the apartheid appellant seeks, those unknowledgeable in what it means to be a true leader of his people would think it would be Chief Joseph. It is not.

Rather, he said as part of a longer speech the following:

**I know that my race must change.** We can not hold our own with the white men as we are. We only ask an even chance to live as other men live. We ask to be recognized as men. *We ask that the same law shall work alike on all men. If the Indian breaks the law, punish him by the law. If the white man breaks the law, punish him also.*

Let me be a free man—free to travel, free to stop, free to work, free to trade where I choose, free to choose my own teachers, free to follow the religion of my fathers, *free to think and talk and act for myself—and I will obey every law, or submit to the penalty.*

*Whenever the white man treats the Indian as they treat each other, then we will have no more wars.* We shall all be alike—brothers of one father and one mother, with one sky above us and one country around us, and *one government for all.* Then the Great Spirit Chief who rules above will smile upon this land, and send rain to wash out the bloody spots made by brothers' hands from the face of the earth. For this time the Indian race are waiting and praying. I hope that no more groans of wounded men and women will ever go to the ear of the Great Spirit Chief above, and *that all people may be one people.*

In-mut-too-yah-lat-lat has spoken for his people.

YOUNG JOSEPH
Washington City, D.C.

Young Joseph, *An Indian's Views of Indian Affairs,* The North American Review, at 433 (Jan. 1879) (emphasis added).

It is time. In 1 A.D, the Nazarene was born; North America was populated with its indigenous aboriginal people. In 1607, we came, and started pushing the American Indian west. In 1787, we formed a new country that did not include the American Indian as a citizen.

In 1863, the Emancipation Proclamation came and went and the American Indian was not treated as if he were part of it.

In 1876, the Plains Indians made their "last stand" against the U.S. Cavalry's orders to herd them on to reservations.

In 1891, all resistance to being herded on to reservations was broken at Wounded Knee, South Dakota. Reportedly, as some of the cavalry killed men, women, babies, and young children with gun shot and saber, some were heard to say, "Here's one for Custer."

1896 came, and although the majority in *Plessy* only sanctioned black apartheid, the American Indian shared in the brunt of its brutal application.

1924 and the Immigration and Nationality Act, 8 U.S.C. § 1401(b), came. It is just that it did not make the American Indian full citizens. Rather it continued the federal-ward relationship which is now a dagger poised at the heart of Indian people.

1954 and *Brown v. Board of Education* came. Ironically, *Plessy* was not meant to **include** the American Indian, but did. *Brown v. Board of Education* in 1954 was not meant to **exclude** the American Indian, but did. At least it has been interpreted that way by some.

It is now *anno Domini,* 1997, 390 years since we set foot, as outsiders, on Plymouth Rock. It is time.

History teaches us that when a group of people have been held down too long, oppressed too long by those who should protect them, the Hunter, Justice, emerges from the shadows and the silence, and then hunts patiently and mercilessly for its prey, injustice, and devours it.

Truth, Ogichida the Warrior, will always survive. It always has.

Judge R.A. Randall

## Epilogue

My concurrence becomes a brief, an advocacy for social justice for Indian people. That is permissible. Judges brief a case, then advocate for justice every time they lift a pen. There are majorities, concurrences, and dissents; none advocate for injustice.

As I examine appellant's request to our court to address the core issue of sovereignty, I can appreciate the observation of George Konrád, the Hungarian patriot, at times called his country's most distinguished writer:

> I am writing my most hazardous book. I have been sentenced to examine myself. To dissect myself in the morgue of my own conscience. To understand without resentment, without self-justification. To describe what hurts, even if that means going *beyond the permissible.*

George Konrád, *A Feast in the Garden,* at 4 (1989) (emphasis added).

Today, Minnesota Indian reservations are in various stages of mismanagement, divisiveness, and suffering the effects of past corruption. Some are close to death throes, as dissident groups battle for control, and no state or federal agency has the courage to take a decisive stand, take charge, and bring peace to the people.

*The present version of "sovereignty" denying reservation residents the benefits of the Minnesota Constitution, the United States Constitution, its Bill of Rights, denying them accountability from tribal government and exempting them from constitutional obligations of due process imposed on the rest of America, is the filthiest piece of misguided patronizing racism this side of hell.*

Konrád went on:

> Lord, give me the grace of veracity, and enlarge my memory. My philosophy can be found in what I did; it is written on my face. To the question, "What is the meaning of Life?", each man answers with his own.
>
> I'd rather be honest than virtuous. If virtue means the approval of my contemporaries for thinking what they think, I can do without virtue. Everyone is convinced that he is moral, at the center of the great hall of our consciousness, each of us sits in blossoming perfection.

*Id.* at 5, 6.

In the Nineteenth Century, the United States War Department and the buffalo hunters almost completed, but did not quite succeed in, the destruction of the American Indian as a people. The myth of sovereignty, if unexposed, will finish the job that our War Department and the buffalo hunters fell short of doing.

This opinion is not a criticism of any one person or any one thing. It is the truth. It is taken directly from public records. The truth I then coupled with analytical reasoning from precedent, from *Cherokee Nation* and its progeny, on forward to, most importantly, *Brown v. Board of Education* and its predecessor, Justice Harlan's monumental dissent in *Plessy.*

There is language, I hope persuasive, on an issue of social justice. That is proper. From time to time on issues of social justice, persuasive language can include analogies, metaphors, and references to essays containing critical thought.

The language may seem strong, but so what. I read *Brown v. Board of Education.* It seemed strong language to me. I read *Dred Scott* (it redefined the phrase "turgid formalistic prose"). It seemed strong language to me. I read the *Plessy v. Ferguson* majority. It seemed strong. Harlan's dissent seemed stronger to me, but apparently was too weak to convince even as much as one colleague. It took 58 years to be persuasive, but his place in history is secure. We know his name. Without looking it up, name me all the majority writers in *Plessy.* Name me three? Name me one?

Is there a place for relentless and unrelenting dissents and concurrences on issues of social justice? There is. For years the United States Supreme Court on death penalty cases had systemic, institutionalized, and unrelenting dissents from Justice Brennan and from Justice Marshall. At times the two were joined by others.

In one of his last official acts as a member of the United States Supreme Court, Justice

Blackmun did not suggest he might consider opposition to the death penalty in the future, he promised it! In *Callins v. Collins,* Justice Blackmun stated in part:

From this day forward, I no longer shall tinker with the machinery of death. For more than 20 years I have endeavored—indeed, I have struggled—along with a majority of this Court, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor. Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated simply to concede that the death penalty experiment has failed. It is virtually self-evident to me now that no combination of procedural rules of substantive regulations ever can save the death penalty from its inherent constitutional deficiencies.

510 U.S. 1141, 1145, 114 S.Ct. 1127, 1130, 127 L.Ed.2d 435 (1994) (Blackmum, J., dissenting).

I promised Indian people I would try to find a solution to the serious internal conflict on reservations today; conflict pitting Indian against Indian, Indian against non-Indian. I promised I would do that with the backdrop of the U.S. Constitution as the "safe harbor." I promised I would dig into the earth, the land of their ancestors, and try to find the "sword turned plow share."

Those who do not know Justice Blackmun may argue that he did not risk his judicial integrity when promising further relentless opposition to the death penalty. They will point out that he made the promise toward the end of his term on the United States Supreme Court.

I do not know Justice Blackmun to be a judge to break a promise. There are promises to keep.